**COOK ASSOCIATES, INC., a Utah corporation, Plaintiff and Respondent,**

v.

**Darrell WARNICK, dba Warnick Sales & Service, and Chief Industries, Inc., Defendants and Appellants.**

**No. 17807.**

Supreme Court of Utah.

April 28, 1983.

 

Lorin N. Pace, William T. Thurman, David L. Bird, Stephen W. Rupp, Salt Lake City, for defendants and appellants.

David G. Williams, Henry K. Chai II, Salt Lake City, for plaintiff and respondent.

OAKS, Justice:

Cook Associates, Inc. (Cook) was constructing a plant for manufacturing slurry explosives, a gelatin-like blasting agent used in open-pit mining. Cook contracted with a dealer to supply parts manufactured by Chief Industries, Inc. (Chief) for the silo storage complex. When Chief delayed delivery of some of these parts for almost a year, Cook brought this action against Chief and the dealer and recovered $56,908 compensatory damages and $5,000 punitive damages against Chief. On appeal, Chief argues that the compensatory damages were predicated on inadmissible evidence and were not established with sufficient certainty nor shown to be foreseeable. Chief also challenges the punitive damage award as unjustified by the evidence. We affirm the compensatory damages, but set aside the punitives.

Dr. Melvin Cook invented slurry explosives. For 22 years, he devoted his efforts to the manufacture and sale of the product. His son, Merrill Cook, managed slurry companies for about 5 years. With this experience, the Cooks began preparations to establish a new business in early 1978. They organized Cook Associates, Inc. and solicited bids for the construction of plants in Minnesota and Utah.

The Minnesota plant included three silos for the storage of ammonium nitrate pellets, an essential ingredient of slurry. Warnick, an exclusive dealer in Chief products (dealer), submitted the most attractive bid for supplying parts to construct these silos. Before accepting this bid, Cook obtained an assurance from the dealer and from a district manager of Chief's that the parts associated with the dealer's bid would be adequate to construct the silos. With this assurance, Cook signed a purchase contract with the dealer on July 11, and the dealer placed a production order with Chief.

The dealer's bid was particularly acceptable to Cook because Chief would deliver the parts quickly. As evidence of this, the dealer gave Cook a written statement with Chief's logo affixed to it that delivery would be on "8/17 or 8/18." On August 17, 1978, Chief notified the dealer and Cook by telephone that all the parts were loaded and ready for shipment. In reliance on this representation, Cook released a $33,660 check to the dealer as payment for the parts. However, the expected shipment did not arrive at the Minnesota plant until the week of September 8, 1978, and many of the ordered parts were missing or defective. After discovering the shortage, Cook telephoned Chief's sales coordinator, who assured him that efforts were being made to complete the shipment. On November 8, 1978, a second shipment arrived, but it still lacked seven essential parts. The last of the parts did not arrive until the week of August 3, 1979.

During the delay, Cook contacted Chief on numerous occasions regarding the delivery. Cook also modified parts on its own and began assembling the silos, but it was

unable to complete them until September of 1979, after the arrival and modification of the final parts. This was 8 months after the date Cook had planned to begin production. The plant experienced its first sales and a net profit of $23,022 in October 1979. Thereafter, its average monthly net profit through the first 13 months of operation was $35,650.[1]

In Cook's action against Chief and its dealer for delays in completing the Minnesota plant, the jury awarded compensatory and punitive damages against Chief, but exonerated the dealer.[2] On appeal, Chief contests only the validity of the damage awards, not its fault in delaying delivery of the parts.

## I. BASIS OF LIABILITY

The jury was instructed on three theories of liability: breach of contract, breach of warranty, and misrepresentation. The jury's general verdict[3] did not expressly identify which theory was used as the basis for the damages awarded, but a study of the entire record leaves little doubt that the award was for breach of contract or warranty, not misrepresentation.

■ General verdicts are to be construed with a view to sustaining the verdict and effectuating the intention of the jury if possible. Where that intention is not clearly apparent from the verdict itself, inferences may be drawn from the evidence, the pleadings, the jury instructions, and other relevant portions of the record. *Mixon v. Riverview Hospital,* 254 Cal.App.2d 364, 62 Cal.Rptr. 379, 387–88 (1967); *Hatfield v. Leverenz,* 35 Ill.App.2d 222, 225–27, 182 N.E.2d 385, 386–87 (1962); 89 C.J.S. *Trial* § 521 (1955). In this case, the jury was instructed that it could award lost profits in connection with the contract theories, and

its award of compensatory damages exactly equaled Cook's evidence of the Minnesota plant's first two months' net profits. In addition, the $56,908 verdict for compensatory damages was more than the $33,660 sought for misrepresentation, but less than the $100,000 sought for breach of contract. Consistent with our obligation to rely on the theory that will best sustain the verdict, *Codekas v. Dyna-Lift Co.,* 48 Cal.App.3d 20, 25–26, 121 Cal.Rptr. 121, 124 (1975), we consider Chief's arguments in terms of contract law, which is the principal theory the parties have argued on this appeal.

## II. SUMMARY OF EARNINGS

■ Chief argues that the district court erred in admitting into evidence a summary of the sales, costs, and net profits of the Minnesota plant for the first 13 months of its operation. Chief first relies on the hearsay rule. Utah R.Evid. 63. Cook counters that Chief waived this point by failing to object to the evidence at trial. Since the record reveals that there was no objection on the basis of hearsay, that theory cannot now be raised on appeal. Utah R.Evid. 4; *Obradovich v. Walker Brothers Bankers,* 80 Utah 587, 602–04, 16 P.2d 212, 217–18 (1932); *In re Van Alstine's Estate,* 26 Utah 193, 203–05, 72 P. 942, 945–46 (1903).

Chief also challenges the admission of the financial summary on the basis of the best evidence rule. Utah R.Evid. 70; U.C.A., 1953, § 78–25–16. That objection was raised at trial, but only by the dealer, who was not joined by Chief. In fact, Chief did not object to the admission of the summary on any ground.

■ Whether an objection by one party properly preserves an objection on appeal as to another party is apparently a question of first impression in this Court. Virtually

---

1. Chief and its dealer also supplied materials for construction of the Utah plant. This plant likewise experienced a delay in commencing operations, but its difficulties were resolved by April 1979, when the Utah plant made its first sales and generated a net profit of $4,205.52. Over the next 19 months, this plant's average monthly net profit was $74,520.

2. The jury returned a verdict against the dealer but exonerated Chief for delays on the Utah plant. That verdict is not before us on this appeal.

3. The verdict in this case was entitled a "special verdict." However, since it failed to specify the theory of liability adopted, it was more in the nature of a general verdict.

every other jurisdiction that has considered the question has concluded that an objection to evidence by one or more parties at trial does not inure to the benefit of other parties who do not join in the objection. *E.g., Thomas v. Bank of Springfield,* Mo. App., 631 S.W.2d 346, 351 (1982); *Wolfe v. East Texas Seed Co.,* Tex.Civ.App., 583 S.W.2d 481, 482 (1979); 4 C.J.S. *Appeal & Error* § 251 (1957). We adopt that rule. Since Chief failed to make its complaint known at trial by objecting on some ground itself or by joining in the dealer's objection, its reliance on the best evidence rule to require the exclusion of the financial summary is not properly before us on this appeal.

## III.  LOST PROFITS

Cook sought $100,000 lost profits incurred during the delay in opening the Minnesota plant. Chief moved for a directed verdict on this claim, arguing (A) that lost profits were not proved with sufficient certainty, and (B) that they were not a foreseeable consequence of breach. The district court denied the motion, which Chief challenges as reversible error because its grounds of objection were sufficient to take the question from the jury. We test that challenge by viewing the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most favorable to the party moved against, and will sustain the denial if reasonable minds could disagree with the ground asserted for directing a verdict. *Winsness v. M.J. Conoco Distributors, Inc.,* Utah, 593 P.2d 1303, 1304 (1979).

### A.  Certainty

■ Lost profits must be established with reasonable certainty. *Penelko, Inc. v. John Price Associates, Inc.,* Utah, 642 P.2d 1229, 1235 (1982). At times, we have described this requirement in terms of proof of "sufficient certainty that reasonable minds might believe from a preponderance of the evidence that the damages were actually suffered." *First Security Bank of Utah v. J.B.J. Feedyards, Inc.,* Utah, 653 P.2d 591, 596 (1982). This requirement ap-

plies to proof of (1) the fact of lost profits, (2) causation of lost profits, and (3) the amount of lost profits. *Id.; Penelko,* 642 P.2d at 1235; 5 A. Corbin, *Corbin on Contracts* § 1022 at 135 (1964). Chief argues that reasonable certainty was lacking in each of these areas.

■ 1. The evidence that net profits could have been made during the delay period was extensive. The Cooks were highly experienced in both the production and sale of slurry. The Minnesota plant was located near the Mesabi Iron Range, one of the largest markets for slurry explosives. Sales at the Utah plant boomed during much of the 8-month delay in opening the Minnesota plant, and Merrill Cook testified that the Minnesota plant could have had sales throughout this time. Moreover, once the plant was in operation, it immediately generated significant sales and profits, which finally resulted in a net profit of $479,080 in the first year of operation. This evidence was ample to put the fact of lost profits to the jury.

2. There was also substantial evidence that the lost profits were caused by Chief's failure to send workable parts in a timely manner. Despite repeated follow-up contacts by Cook, the final shipment of parts for the silos was not received until almost a year after it was promised. Once the parts were received and modified, the plant quickly became operational, earning its first profits within a month. Merrill Cook testified that operations could have commenced 8 months sooner if the parts had been sent earlier.

3. Chief also contends that the amount of lost profits was not established with reasonable certainty. In making this argument, Chief asserts that no recovery should have been allowed for lost profits because, as a new business, the Minnesota plant had no prior history from which to approximate their amount. In support of this view, Chief cites our statement of the general rule in *Jenkins v. Morgan,* 123 Utah 480, 486–87, 260 P.2d 532, 535 (1953):

[B]efore special damages for loss of profits to a general business occasioned by the

wrongful acts of another may be recovered, it must be made to appear that the business had been in successful operation for such a period of time as to give it permanency and recognition, and that such business was earning a profit which could be reasonably ascertained and approximated.

Chief also refers to our statement that the "general rule is that loss of anticipated profits of a business venture [involves] so many factors of uncertainty that ordinarily profits to be realized in the future are too speculative to base an award of damages thereon." *First Security Bank of Utah v. J.B.J. Feedyards, Inc.,* 653 P.2d at 596.

■ While we reaffirm our disapproval of "speculative" awards of lost profits, as voiced in these statements of the "general rule," we conclude that the "pivotal question is not whether the plaintiff has proven an established earning record but whether he has proven the damages for lost profits with reasonable certainty, although the former is often relevant to the latter." *Clark v. International Harvester Co.,* 99 Idaho 326, 346–47, 581 P.2d 784, 804–05 (1978). *Accord, Wyoming Bancorporation v. Bonham,* Wyo., 563 P.2d 1382, 1385 (1977). A record of past earnings obviously increases the certainty with which one could predict future profits. But that fact should not automatically preclude new businesses from recovering lost profits because they lack such a record. Rather, new businesses should be allowed to try to prove lost profits up to a reasonable level of certainty by other means, just as established businesses are permitted to do.[4] *See, e.g., Welch v. U.S. Bancorp Realty & Mortgage Trust,* 286 Or. 673, 703–05, 596 P.2d 947, 963 (1979); *S. Jon Kreedman & Co. v. Meyers Brothers Parking-Western Corp.,* 58 Cal.App.3d 173, 184–85, 130 Cal.Rptr. 41, 49 (1976); U.C.C. § 2–708 comment 2, 1A U.L.A. 377 (1976); R. Dunn, *Recovery of Damages for Lost Profits* § 4.2 (2d ed. 1981).

■ Once a defendant has been shown to have caused a loss, he should not be allowed to escape liability because the amount of the loss cannot be proved with precision. *Winsness,* 593 P.2d at 1306; *Gould v. Mountain States Telephone & Telegraph Co.,* 6 Utah 2d 187, 192, 309 P.2d 802, 805 (1957). Consequently, the reasonable level of certainty required to establish the *amount* of a loss is generally lower than that required to establish the *fact* or *cause* of a loss. *Terry v. Panek,* Utah, 631 P.2d 896, 897–98 (1981); 5 A. Corbin, *supra,* at 137 n. 84.

■ The certainty requirement is met as to the amount of lost profits if there is sufficient evidence to enable the trier of fact to make a reasonable approximation. *Winsness,* 593 P.2d at 1305–06; *Security Development Co. v. Fedco, Inc.,* 23 Utah 2d 306, 310, 462 P.2d 706, 709 (1969); 5 A. Corbin, *supra,* at 124, 135, 156–57; 11 S. Williston, *A Treatise on the Law of Contracts* § 1345 at 234 (3d ed. 1968). What constitutes such an approximation will vary with the circumstances. Greater accuracy is required in cases where highly probative evidence is easy to obtain than in cases where such evidence is unavailable. *Winsness,* 593 P.2d at 1306.

As proof of the amount of loss in this case, Cook provided the financial summary discussed in Part II. It provided a breakdown of monthly sales volumes, costs of sale, and net profits for the first 13 months. This gave the jury a basis to award damages for whatever period of time it found profits to have been lost. Cook also introduced the evidence described earlier on the fact of lost profits, including the net profits earned at the Utah plant during the delay in Minnesota. This evidence would permit the jury to make a reasonable approximation of the amount of loss.

### B.   Foreseeability

Chief also argues that lost profits were not shown to be a reasonably foreseeable consequence of breach or to have been con-

---

**4.** Alternative means of establishing the certainty of lost profits include expert testimony of profit potential, evidence of the actual profits of similar businesses, and evidence of subsequent earnings of the business claiming lost profits.

templated by the parties at the time the contract was made. Chief asserts that there was no evidence that the parties "mutually [understood] that lost profits [would] be included in damages should breach occur." By this argument, Chief in effect urges adoption of the "tacit agreement test" of foreseeability, which requires that the defendant expressly or impliedly agree to assume liability for consequential damages. Stone, "Recovery of Consequential Damages for Product Recall Expenditures," 1980 *B.Y.U.L.Rev.* 485, 491. That rule cannot be applied in this case.

■ Since this case involves a sale of goods, the Uniform Commercial Code is applicable. U.C.A., 1953, §§ 70A–2–102, 70A–2–105(1), 70A–2–106(1). Section 70A–2–715(2)(a) of the U.C.C. states the foreseeability requirement as follows:

> Consequential damages resulting from the seller's breach include
>
> (a) any loss resulting from *general or particular requirements and needs of which the seller at the time of contracting had reason to know* .... [Emphasis added.]

In establishing this requirement, the drafters of the U.C.C. clarified that "[t]he 'tacit agreement' test for the recovery of consequential damages is rejected." U.C.C. § 2–715 comment 2, 1A U.L.A. 446 (1976). All that is required under the language of this provision, which was adopted in Utah, is that the seller at the time of contracting have reason to know of the general or particular requirements and needs of the buyer that result in the loss. *Id.* at comments 2 & 3; J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 10–4 at 387–95 (2d ed. 1980); Stone, *supra,* at 488–89, 493–94.

■ Testimony at trial showed that the dealer told Chief that the parts Cook was ordering were needed to construct silos for the storage of ammonium nitrate pellets, which would be used in a slurry manufacturing plant. In addition, Cook emphasized to Chief that it was relying on Chief to supply all parts necessary to construct the silos. This evidence is sufficient to support a conclusion that Chief had reason to know that an inordinate delay on its part could prevent Cook's production and sale of slurry, thereby causing a loss of profits. *See* J. White & R. Summers, *supra;* 11 S. Williston, *supra,* at 254–55.

For the reasons set out above, the judgment on the verdict for compensatory damages will be affirmed.

## IV. PUNITIVE DAMAGES

■ Chief's objection to the award of punitive damages is well taken. It is settled as a general rule (subject to exceptions not here pertinent) that a plaintiff cannot recover punitive damages for a breach of contract. *Jorgensen v. John Clay & Co.,* Utah, 660 P.2d 229 (1983); *Hal Taylor Associates v. Unionamerica, Inc.,* Utah, 657 P.2d 743, 750 (1982); 11 S. Williston, *supra,* § 1340; 5 A. Corbin, *supra,* at 438–39; 22 Am.Jur.2d *Damages* § 245 (1965). However, where an independent tort is committed in the context of the performance or breach of a contract, punitive damages may be recovered together with compensatory damages for that tort. *Jorgensen,* 660 P.2d at 232; *Hal Taylor Associates,* 657 P.2d at 750; *Leigh Furniture & Carpet Co. v. Isom,* Utah, 657 P.2d 293 (1982); *Clayton v. Crossroads Equipment Co.,* Utah, 655 P.2d 1125, 1131 (1982); *First Security Bank of Utah v. J.B.J. Feedyards, Inc.,* Utah, 653 P.2d 591 (1982).

■ In this case, it appears that the compensatory damages the jury awarded were for breach of contract, not for the tort of misrepresentation. *See* Part I.[5] Moreover, it is doubtful that Cook could recover for both breach of contract and misrepresentation on the facts of this case. Here, Chief's misrepresentation that the parts

---

**5.** If there is doubt whether the general verdict awarded damages for tort, the consequences of that doubt must be charged to plaintiff Cook, who had the burden of requesting special verdicts to separate the two recoveries for purposes of review. *State v. Anderson,* 27 Utah 2d 276, 278, 495 P.2d 804, 805; *Rodgers v. Kemper Construction Co.,* 50 Cal.App.3d 608, 617, 124 Cal.Rptr. 143, 147–48 (1975).

were loaded and ready for shipment induced Cook to remit the contract compensation sooner than required. The damages sought under this count were $33,660, which was the amount remitted. This requested return of the contract consideration would be at odds with Cook's requested recovery of incidental and consequential damages for breach of contract. Consequently, the cause of action for tort seems to be presented as an alternate rather than an addition to the cause of action for breach of contract. Though such pleading is permissible under our authorities, *Dairyland Insurance Corp. v. Smith,* Utah, 646 P.2d 737, 740 (1982); *Smoot v. Lund,* 13 Utah 2d 168, 170–71, 369 P.2d 933, 934–35 (1962), the court could not properly enter judgment on both theories, since that would represent a double recovery. *Brigham City Sand & Gravel v. Machinery Center, Inc.,* Utah, 613 P.2d 510, 511–12 (1980).

The verdict for punitive damages cannot be sustained because the record does not show an award of compensatory damages in tort to which such punitive damages could be ascribed. Moreover, as noted above, even if tort compensatory damages had been awarded, it is doubtful that judgment could be entered on that theory in addition to the judgment entered for breach of contract.

The judgment is modified by striking the $5,000 of punitive damages, and as so modified is affirmed. No costs awarded.

HALL, C.J., and STEWART, HOWE and DURHAM, JJ., concur.