Elizabeth Ann BARSON, a minor by and through her guardians ad litem, Dennie J. Barson and Kathleen W. BARSON, Plaintiff and Respondent,

v.

E.R. SQUIBB & SONS, INC., Defendant and Appellant.

No. 18254.

Supreme Court of Utah.

April 12, 1984.

Ray R. Christensen, Salt Lake City, for defendant and appellant.

Louis Racine, Jr., Gordon J. Low, Robert C. Huntley, Jr., La Mont Jones, Pocatello, Idaho, Logan, Pocatello, Idaho, for plaintiff and respondent.

HALL, Chief Justice:

This is a products liability action, brought by Kathleen and Dennie Barson as guardians ad litem for Elizabeth Ann Barson against E.R. Squibb and Sons (Squibb), a New Jersey corporation. In the complaint, it was alleged that Elizabeth had suffered serious birth defects as a result of the prenatal administration to her mother of a progestational drug, Delalutin, manufactured by Squibb. Plaintiffs' suit was based on three separate theories: negligence, breach of warranty and strict liability. Squibb appeals the jury verdict of $1.5 million for Elizabeth and seeks a new trial.

Elizabeth is the third child of Kathleen and Dennie Barson. The Barsons' two older children were born following normal, uncomplicated pregnancies and were and are healthy individuals.

Kathleen Barson first suspected she was pregnant with Elizabeth sometime during the first week of July, 1972. Since her doctor during her previous pregnancies had passed away, Mrs. Barson contacted Dr. L. Spencer Parkinson of Logan, a practicing obstetrician/gynecologist, and made an appointment to see him on August 4. However, during the last week of July, Mrs. Barson experienced some spotting (vaginal bleeding). Since this had not occurred in her previous pregnancies, she contacted Dr. Parkinson, who saw her on July 26. Parkinson did not conduct a physical examination at that time, although he did conduct a pregnancy test, which proved positive. Parkinson also gave Mrs. Barson an intramuscular injection of Delalutin, ostensibly to prevent miscarriage. When Mrs. Barson voiced concern about taking any type of drug while pregnant, Parkinson told her not to worry since Delalutin was harmless and was a hormone that women naturally have in their bodies. Two more shots of Delalutin were subsequently administered, one on August 4 and a third in October. Mrs. Barson took no other drugs during her pregnancy.

Elizabeth was born on March 26, 1973, with multiple birth defects, the most serious of which was total absence of arms (amelia). Elizabeth also had a coloboma of her right eye, hypoplasia, an abnormally small tongue, atresia of the ear canal, ear deformations and abnormal placement, scoliosis and a rectal tag. Chromosome tests showed normal.

The drug Delalutin, which plaintiffs allege to be a teratogen [1] and the cause of Elizabeth's birth defects, was developed and patented by Scharing, A.G., a German pharmaceutical company. Scharing, A.G., licensed its patent on Delalutin to Squibb in 1955. Squibb began marketing Delalutin in the United States in 1956.

Delalutin is a progestational hormone, with the specific chemical designation 17-alpha-hydroxyprogesterone caproate. The caproate ester, attached to the hydroxyprogesterone, makes Delalutin biologically more active than naturally occurring progestational hormones.

Progestational hormones are essential in the maintenance of a pregnancy since they are responsible for the relaxation of the uterus, allowing expansion to accommodate a full-term baby. A deficiency in progestogens may cause miscarriage or spontane-

---

1. A teratogen is a drug that causes birth defects. The word is derived from the Greek word "tera" (monster) and the Latin word "genesis" (to create).

ous abortion. Squibb marketed Delalutin for, among other things, the prevention of habitual and recurrent abortions. Dr. Parkinson administered Delalutin to Mrs. Barson for this purpose.

Squibb argues that it should be granted a new trial on several grounds.

## I

Squibb first contends that the jury instructions on breach of warranty and strict liability were so vague and misleading as to constitute reversible error and that the court erred in submitting the issue of negligent testing to the jury since there was insufficient evidence to support it.

Squibb did not request special interrogatories in this case. Therefore, the general verdict returned by the jury contained nothing to indicate which theory or theories the jury relied on in reaching its verdict.

■ This Court exercises every reasonable presumption in favor of the validity of a general verdict.[2] Where, as here, more than one cause of action is submitted to the jury, if one of the causes of action is error-free, is supported by substantial evidence and provides an appropriate basis for the general verdict, we will affirm that verdict.[3]

We therefore proceed to consider whether there was sufficient evidence to submit the case to the jury on negligence grounds and to sustain its verdict for Elizabeth Barson. In this consideration, we must interpret the evidence in the light most favorable to the jury verdict.[4] Plaintiffs alleged at trial that Squibb was negligent with respect to manufacture, production, sales and distribution of Delalutin in several respects: failing to adequately test the drug; failing to warn of its inherent dangers; negligently inspecting, advertising and recommending the drug for use; and representing that the drug was safe for use.

■ This Court has defined negligence as "a failure to exercise the degree of care which a reasonable person would have exercised under the same circumstances, whether by acting or by failing to act."[5] The Court has further said: "In cases where the alleged negligence consists of a failure to act, the person injured by another's inaction must demonstrate the existence of some special relationship between the parties creating a duty on the part of the latter to exercise such due care in behalf of the former."[6] In a products liability case, the plaintiff must therefore prove that there was a duty owed by the defendant to the plaintiff, that the duty was breached and that the conduct complained of was the cause in fact of the injury.

■ The manufacturer of ethical drugs has the duty of making timely and adequate warnings to the medical profession of any dangerous side effects produced by its drugs of which it knows or has reason to know.[7] The manufacturer is directly liable to the patient for the breach of such duty.[8]

■ In determining whether a manufacturer has breached that duty and the extent to which a manufacturer is required to know of dangers inherent in its drug, it is important to point out that the drug manufacturer is held to be an expert in its particular field and is under a "continuous duty ... to keep abreast of scientific developments touching upon the manufacturer's product and to notify the medical profession of any additional side effects discover-

---

**2.** *Leigh Furniture & Carpet Co. v. Isom,* Utah, 657 P.2d 293 (1982). *See also Cook Assocs., Inc. v. Warnick,* Utah, 664 P.2d 1161 (1983).

**3.** *Leigh Furniture, supra* n. 2, at 301–02. *See also Warnick, supra* n. 2, at 1164.

**4.** *State v. Ontiveros,* Utah, 674 P.2d 103 (1983); *State v. Brooks,* Utah, 638 P.2d 537 (1981).

**5.** *DCR Inc. v. Peak Alarm Co.,* Utah, 663 P.2d 433, 434 (1983).

**6.** *Id.* at 435.

**7.** *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 528 P.2d 522 (1974).

**8.** *Id.*

ed from its use."[9] The drug manufacturer is responsible therefore for not only "actual knowledge gained from research and adverse reaction reports,"[10] but also for "constructive knowledge as measured by scientific literature and other available means of communication."[11]

There is substantial testimony by Dr. Alan K. Done, Dr. James J. Nora and Dr. Allen S. Goldman as to what Squibb knew or should have known prior to injection of Delalutin into Mrs. Barson in 1972. Drs. Done, Nora and Goldman reviewed, among other things, the pre-1972 literature on progestogens and teratogenicity and indicated studies that discussed these. Dr. Nora specifically testified that there was sufficient scientific information and literature relative to progesterones prior to 1972 to make a prudent drug manufacturer do teratogenicity studies on any progesterone agent, including Delalutin. Further, the testimony indicated that while there were no tests per se on Delalutin prior to 1972, there were tests on other progestational drugs[12] that clearly indicated that progestogens were teratogenic. Dr. Done testified, as did Drs. Nora and Goldman, that if one progestational agent showed teratogenic effects, the drug manufacturer should be put on notice as to all other progesterone agents, since all progesterones have similar effects. Finally, there were internal Squibb documents admitted into evidence that showed internal concern over the lack of testing of Delalutin for teratogenicity.

■ Since 1962, the Food and Drug Administration (FDA) has required teratogenicity testing on all new drugs. In 1966, the FDA established guidelines regarding teratogenicity testing. Since Delalutin was not a "new" drug as defined by the guidelines, there was no federal requirement that Squibb test Delalutin for teratogenicity; testimony indicated that Squibb had never

done so. However, these standards are merely minimum standards. Even after all of the government requirements have been met, if there are dangers that the ethical drug manufacturer knew or should have known about, the manufacturer may still be subject to liability.[13]

■ In this case, there was substantial evidence, both testimonial and documentary, that Squibb knew or should have known that progestational agents, including Delalutin, had teratogenic effects and could cause the kind of harm suffered by Elizabeth Barson. Squibb also produced substantial evidence to prove its lack of knowledge and need for teratogenic testing prior to 1972. However, it is not this Court's function to resolve these questions of fact. That task devolves upon the jury, and as long as there is sufficient evidence to support its conclusion, we will not disturb it.

As the final element of plaintiffs' cause of action, it was incumbent upon them to prove that Squibb's negligent conduct was the cause in fact of Elizabeth's birth defects.

Mrs. Barson testified that she had expressed strong concern over taking any drugs during her pregnancy, but allowed the Delalutin injections after being assured by Dr. Parkinson that they were safe. Dr. Parkinson testified that he relied on the package inserts, the *Physicians' Desk Reference* and general knowledge in the profession in prescribing Delalutin for Mrs. Barson. The 1972 package insert indicated that Delalutin was probably effective in pregnant women to prevent habitual and threatened abortion and was safe for that purpose. Thus, there was sufficient evidence for the jury to conclude that had proper testing been done on and/or proper warning been given as to the teratogenic effects on offspring of progestational

---

9. *Id.* at 528 (quoting *Schenebeck v. Sterling Drug, Inc.,* 423 F.2d 919, 922 (8th Cir.1970)).

10. *Id.* 528 P.2d at 528.

11. *Id.* at 529.

12. For example, Deladroxate and Gestest.

13. *See, e.g., Yarrow v. Sterling Drug, Inc.,* 263 F.Supp. 159 (D.S.D.1967), *aff'd,* 408 F.2d 978 (8th Cir.1969). *See also McEwen, supra,* n. 7.

agents given to pregnant women, Mrs. Barson would never have been injected with Delalutin.

Finally, Drs. Nora, Done and Goldman all stated that, in their opinions, based on studies done by them and on review of the literature and the studies of others, the injections of Delalutin were the cause in fact of Elizabeth Barson's birth defects.

Assuredly, Squibb elicited substantial contrary evidence on all of the elements of the negligence cause of action. However, there was sufficient evidence to support a jury verdict for Elizabeth Barson on negligence grounds. Therefore, we do not reach the assertions of error by Squibb regarding strict liability and breach of warranty.

## II

Squibb next contends that certain evidence was admitted in contravention of the Rules of Evidence and was so prejudicial as to jeopardize a fair trial. Specifically, Squibb challenges admission of certain package inserts included with Delalutin, an exhibit containing references to drug experience reports and evidence relating to the efficacy of Delalutin.

### A

Since 1956, when Squibb began marketing Delalutin in the United States, Delalutin packages have contained inserts that included instructions for prescribing and treating physicians on the proper use of the drug and warnings as to possible side effects. Since 1968, the content of these inserts has been regulated by the FDA under its uniform labelling regulations.

Squibb objected to the admission of the inserts contained in post-1972 packages. It did not object to the admission of the Dela-

lutin insert in force at the time of the injection in question.

On appeal, Squibb argues that the package inserts were inadmissible as hearsay, inadmissible as evidence of subsequent remedial conduct in contravention of U.R.E. 51 and inadmissible because their prejudice outweighs their probativeness in contravention of U.R.E. 45.

■ In this case, the admission of the inserts was extensively argued and briefed to the trial court. During pretrial, Squibb made a motion in limine to suppress any mention of package inserts included with Delalutin after 1972.[14] The judge declined to rule on the motion until the issue was raised at trial. The record shows that during oral argument to the judge on the suppression motions, both during pretrial and trial, Squibb relied on U.R.E. 51 and on possible prejudice to Squibb. Apparently, no clear objection was raised on grounds of inadmissible hearsay. Although it is conceivable that the argument was raised in Squibb's supporting memo or off the record, the record before us does not indicate it. The burden is always on the party objecting to make certain that the record adequately preserves an objection or argument for review in the event of an appeal.[15]

■ In order to preserve a contention of error on appeal, the party claiming error in admission of evidence must raise the objection to the trial court in clear and concise terms and in a timely fashion calculated to obtain a ruling thereon.[16] Where there was no clear and definite objection on the basis of hearsay, that theory cannot now be raised on appeal. Squibb did raise a hearsay objection after judgment was entered in the case. However, issues raised for the first time in post-judgment motions are raised too late to be reviewed on appeal.[17] Therefore, we are precluded

---

**14.** A memo in support of that motion was apparently submitted to the trial judge, but is not part of the record on appeal. Therefore, we have no way of knowing what was or was not argued in that memo.

**15.** *Franklin Financial v. New Empire Dev. Co.,* Utah, 659 P.2d 1040 (1983).

**16.** U.R.E. 4; *Warnick, supra* n. 2; *State v. Malmrose,* Utah, 649 P.2d 56 (1982).

**17.** *Franklin, supra* n. 15, at 1045.

from addressing this assertion of error on the merits.

■ Squibb also contends that admission of the post-1972 package inserts violates U.R.E. 51. The law is well settled that evidence of remedial or precautionary measures taken after an incident are inadmissible to prove negligence or culpable conduct.[18] The trial judge, however, admitted the post-1972 package inserts for the limited purpose of proving a defect in the drug under strict liability and specifically excluded the inserts for the purpose of proving negligence. Since we have already determined, *supra*, that there was sufficient evidence to submit the case to the jury on negligence grounds and since the inserts were specifically excluded as evidence going to negligence, we need not reach the issue of whether the subsequent remedial conduct rule applies in strict liability cases.

■ Squibb finally maintains that the probative value of the post-1972 inserts is far outweighed by the prejudice to Squibb's case and should have been excluded under U.R.E. 45. Squibb as appellant has the burden of demonstrating that any error has affected its substantial rights under Utah R.Civ.P. 61. It has failed to carry that burden here.

Squibb suggests that the jury verdict turned substantially on admission of the package inserts. Since the verdict was general, that cannot be established. Further, the substantial evidence in the record as to Squibb's liability would tend to relegate the package inserts to a more minor role as cumulative evidence. Finally, the record reflects that the package inserts were specifically admitted only for the purpose of proving defect under strict liability. Any failure on the part of the trial court to make that clear to the jury is directly attributable to Squibb. Therefore, we find no error in admission of the package inserts under Rule 45.

B

Squibb also challenges the admission of evidence and testimony relating to drug experience reports (DERs).

The Federal Food, Drug and Cosmetic Act requires that drug manufacturers forward to the FDA any information they receive, including scientific studies, unpublished studies and reports of use experiences by physicians in the field concerning any ethical drug that has been approved by the FDA.[19] These reports are used by the FDA to continually monitor approved drugs and relied on as a bellwether to indicate potential need for withdrawal of the drug from the market.[20]

Exhibit 58 is a summary compilation made by Dr. Done of more than 50 studies and reports dealing with progesterone exposure during pregnancy and the frequency of malformations in babies born from these pregnancies. One of the studies listed in the compilation summarizes the DERs received by the FDA relating to progestogens, Delalutin specifically mentioned among them. Squibb objected to admission of Exhibit 58 early in the trial, relying in general on the absence of the learned treatise rule in the Utah Rules of Evidence to support its objection. Squibb did not base its objection to Exhibit 58 on the inclusion of the DER summary in that exhibit. The court admitted the exhibit. Much later in the trial, Squibb again challenged the already-admitted Exhibit 58, this time on the basis of inclusion of the DER summary. The trial court refused to withdraw the exhibit.

On appeal, Squibb does not directly challenge the original introduction of Exhibit 58. Instead, Squibb contends that Exhibit 58 was inadmissible because the DER summary was included in it. Squibb argues that the DERs constituted inadmissible multiple hearsay and were not the best evidence, in violation of U.R.E. 70.

18. U.R.E. 51. *See also Harris v. Utah Transit Authority,* Utah, 671 P.2d 217 (1983).

19. 21 U.S.C. § 355(j); 21 C.F.R. § 310.300.

20. *See id.*

During the trial, Squibb did not at any time object to admission of Exhibit 58 on the basis of U.R.E. 70. An objection to evidence not raised at trial will not be considered on appeal:

> The contemporaneous objection rule long adhered to in this state requires *timely* and *specific* objection to admission of evidence in order for the question of admissibility to be considered on appeal. The rule is a salutory procedural tool serving a legitimate state purpose. By making use of the rule, counsel gives the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial. Furthermore, the rule is practically one of necessity if litigation is ever to be brought to an end.[21]

(Emphasis added.)

Squibb also objects to testimony by Dr. Done relating to the DERs, contending that it was based on inadmissible hearsay. This contention has no merit. Facts or data used by a properly qualified expert in forming an opinion need not be in evidence if they are of a type reasonably relied on by experts in the witness's field of expertise.[22]

Dr. Done was qualified by the court as an expert without objection by Squibb. Part of Dr. Done's value to plaintiffs as an expert witness came from his experience as a special assistant in the Bureau of Drugs, Food and Drug Administration.

Rule 56(2)(b) of the Utah Rules of Evidence provides that if the witness is an expert the testimony is limited to "such opinions as the judge finds are ... within the scope of the special knowledge, skill, experience or training possessed by the witness." In interpreting Rule 56(2)(b), this Court said:

> [O]nce the expert is qualified by the court, the witness may base his opinion on reports, writings or observations not in evidence which were made or compiled by others, so long as they are of a type reasonably relied upon by experts in that particular field. The opposing party may challenge the suitability or reliability of such materials on cross-examination, but such challenge goes to the weight to be given the testimony, not to its admissibility.[23]

This allows considerable discretion in the trial judge. However, we will not disturb the trial judge's rulings absent an abuse of that discretion. We find no such abuse here.

The judge reasonably could have concluded that the DERs were reports or observations not in evidence, made or compiled by others, that experts in the FDA or elsewhere could reasonably rely on to assist them in forming an opinion. Further, the trial judge clearly had cause to believe that an opinion by Dr. Done, based partially on the DERs, was within the scope of his special knowledge, skill, experience and training, both because of his impressive credentials as summarized in his curriculum vitae and because of his tenure with the FDA. Finally, Squibb had ample opportunity to expose any weaknesses in Done's testimony, to argue the credibility and reliability of the DERs and to attempt to discredit both. The trial court thus did not err in allowing Dr. Done's testimony on the DERs.

### C

Squibb also challenges the admission of evidence relating to the efficacy of Delalutin.

Squibb made a motion in limine to prevent plaintiff from introducing any evidence of efficacy during the trial, claiming that such evidence was irrelevant and immaterial to the issue of the drug's safety. The judge declined to rule before the trial,

---

**21.** *State v. McCardell,* Utah, 652 P.2d 942, 947 (1982) (quoting *Baker v. State,* 204 Kan. 607, 611, 464 P.2d 212, 216 (1970)).

**22.** *State v. Clayton,* Utah, 646 P.2d 723 (1982). *See also Edwards v. Didericksen,* Utah, 597 P.2d 1328, 1332 n. 2 (1979).

**23.** *Clayton, supra* n. 22, at 726.

preferring instead to rule on admission in the context of the trial. When the issue finally arose upon defendant's objection to introduction of certain evidence by plaintiffs, the judge ruled that defendant itself had opened the door to the testimony. We agree.

Squibb introduced the issue of efficacy, beginning with the first witness at trial. During cross-examination of Mrs. Barson, plaintiffs' first witness, counsel for defendant solicited testimony relating to whether the injection of Delalutin did what it was supposed to do, that is, stop spotting. Squibb next solicited cross-examination testimony from plaintiffs' second witness, Dr. Parkinson, as to his opinion concerning the effectiveness of Delalutin. Plaintiffs did not raise the issue of efficacy with either witness.

We do not need to reach the issue of whether or not efficacy evidence was in and of itself admissible, since, even if the evidence was inadmissible, "if a party interjects into a case incompetent evidence tending to establish immaterial or unrelated facts, he cannot complain on appeal that his adversary subsequently offered and was permitted to introduce the same kind of evidence." [24]

■ Curative admissibility of evidence is a matter within the discretion of the trial court, and we will not disturb that decision absent an abuse of discretion.[25] There is no such abuse here.

### III

Finally, Squibb contends that it is entitled to a new trial based on newly discovered evidence.

On November 5, 1981, subsequent to the verdict in this case, the Fertility and Maternal Health Drugs Advisory Committee, Bureau of Drugs, FDA, held a meeting.[26] At that meeting, a hearing as to the safety and efficacy of progesterone and 17-alpha-hydroxyprogesterone caproate (Delalutin) for the treatment of reproductive disorders was held. Presentations were made by eleven persons, all supportive of the use of progesterone and hydroxyprogesterone in pregnant and in potentially pregnant women.[27] Witnesses for Squibb at trial were among those making presentations to the committee. The presentations made contained essentially the same substance as the testimony given by Squibb's witnesses at the trial in this case. No witness for Barson was heard by the committee. Following the presentations on November 5, the Advisory Committee agreed to make a recommendation to the FDA that labelling changes be made to progesterone and 17-alpha-hydroxyprogesterone caproate packages. The change suggested would state that these drugs "do not *appear* to have any *significant* teratogenic potential." (Emphasis added.)

The record does not show that a formal recommendation was ever made or if made, its actual format. The record also does not reflect the response of the FDA, if any. The record merely includes the minutes of an advisory committee meeting where it was agreed to make the recommendation.

Defendant contends that this constitutes sufficient newly discovered evidence to support the granting of a new trial. We do not agree.

Rule 59(a) of the Utah Rules of Civil Procedure provides:

> [A] new trial may be granted to all or any parties and on all or part of the issues, for any of the following causes . . . :

.    .    .    .    .

---

**24.** *United States v. Regents of New Mexico School of Mines,* 185 F.2d 389 (10th Cir.1950). *See also* I Wigmore on Evidence § 15 (3d ed. 1940 & Supp.1982).

**25.** *Workman v. Henrie,* 71 Utah 400, 266 P. 1033 (1928).

**26.** This committee serves in an advisory capacity to the FDA. The FDA is not obliged to follow the committee's recommendations.

**27.** One witness in opposition to the labelling change recommendation was heard at a subsequent meeting on February 11, 1982.

(4) Newly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at trial.

The moving party must therefore show three things in order for a new trial to be granted on the basis of newly discovered evidence:

(a) [T]here is material, competent evidence which is in fact newly discovered; (b) by due diligence the evidence could not have been discovered and produced at trial; and (c) the evidence must not be merely cumulative or incidental but must be of sufficient substance that there is a reasonable likelihood that with it there would have been a different result.[28]

Defendant did not meet this burden.

While there is no doubt that the evidence defendant relies on is newly discovered and could not have been discovered and produced at trial, it is not of sufficient substance that it could reasonably be assumed that the outcome of the trial would have been different.

The trial judge below based his denial of Squibb's motion for a new trial on his conclusion that the testimony presented to the committee was merely cumulative to that elicited at trial and was in fact a reiteration of the trial testimony, with no new findings apparent. The judge further suggested that the committee recommendation, as suggested in the minutes, was not substantive enough to draw any conclusions as to Delalutin's teratogenicity.

The trial judge, in granting or denying a motion for a new trial, has broad latitude. This Court will not overturn that disposition absent a clear abuse of discretion by the trial judge.[29] There is no such abuse in this case. The evidence is a purported recommendation made by an advisory committee, phrased in extremely ambiguous language, based on evidence cumulative to that presented at trial and cumulative in itself. We see no likelihood that the

outcome at trial would have been different if this evidence had been available.

The judgment of the trial court is affirmed.

STEWART, OAKS and DURHAM, JJ., concur.

HOWE, Justice (dissenting):

I dissent from the following statement in Part I and in its application in this case: ·Where, as here, more than one cause of action is submitted to the jury, if one of the causes of action is error-free, is supported by substantial evidence and provides an appropriate basis for the general ·verdict, we will affirm that verdict. The opinion of the Court cites as authority for that rule *Leigh Furniture and Carpet Co. v. Isom,* Utah, 657 P.2d 293 (1982). However, as I endeavored to point out in a concurring opinion in that case, it was not necessary to there employ that rule since the jury instruction under scrutiny did not offer alternatives or choices to the jury as to separate torts or theories of recovery. I reserved expression of any opinion on ·the rule until it was squarely before us. This case presents that opportunity.

The majority opinion cites no authority for the rule other than *Leigh Furniture and Carpet Co. v. Isom,* supra. The latter case cited a number of cases from other jurisdictions where the rule had been applied. However, no mention was made that the various jurisdictions in this country are divided in their adoption and support of the rule. Contrary cases were not cited or discussed. In my concurring opinion, I noted the division and cited *Bredouw v. Jones,* Okl., 431 P.2d 413 (1967); *Heinen v. Heinen,* 64 Nev. 527, 186 P.2d 770 (1947); and *Martin v. Northern Pacific Railway,* 51 Mont. 31, 149 P. 89 (1915), as representatives of the contrary viewpoint. See those cases and *Maccia v. Tynes,* 39 N.J.Super. 1, 120 A.2d 263 (1956) for a compilation of authorities on each side. The latter case

28. *Gregerson v. Jensen,* Utah, 617 P.2d 369, 372 (1980).

29. *Nelson v. Trujillo,* Utah, 657 P.2d 730 (1982).

characterized the rule as a minority rule, rejected its adoption in that state and held that there must be a reversal even if the error infects only one of the issues.

In those jurisdictions which adopt the rule, it often finds application where an error is made in instructing the jury as to one of several theories of recovery advanced by the plaintiff or when an insufficiency of evidence to sustain one such theory is found by the appellate court. Ohio, which has produced perhaps the greatest number of cases on the subject, terms the rule the "two-issue rule" but has restricted it to erroneous instructions to the jury and has not applied it to errors relating to the admission or rejection of evidence. *Croke v. Chesapeake and Ohio Railway Co.*, 86 Ohio App. 483, 93 N.E.2d 311 (1949).

I oppose the adoption of the rule in this state. The rule hangs on the factually unsound tenuous presumption that the jury found for the prevailing party on the cause or causes of action or on the defenses which are error-free. To indulge in such presumption is to me an abdication of our responsibility as a reviewing court. The Supreme Court of Nevada in *Heinen v. Heinen*, supra, adopted the contrary rule, to wit, that where two or more material issues are tried and submitted to the jury and the verdict is a general one, it cannot be upheld if there was error as to one of the two or more issues. The court said that "the reasoning of the cases supporting this rule appear to us to be the better logic ...." In *Maccia v. Tynes*, supra, the court charged that the rule relied upon by the majority opinion in the instant case was "less equitable." Similarly, the court in *Tisdale v. Panhandle & S.F. Railway Co.*, Tex.Com.App., 228 S.W. 133 (1921) rejected the rule as "unsound." In my opinion, the rule is inconsistent with our decisions in *Ivie v. Richardson*, 9 Utah 2d 5, 336 P.2d 781 (1959) and *Watters v. Querry*, Utah, 588 P.2d 702 (1978) where we reversed jury verdicts because one instruction given was erroneous even though other instructions which were inconsistent therewith properly stated the law. In the latter case we explained:

The fact that the other instructions were given inconsistent with the one in question and consistent with the law cannot properly be regarded as curing the misconception the jury might have formed from the erroneous instruction complained of. The jurors would not know which instruction was correct and which one was in error and thus would simply be in the position of not knowing which instruction to follow; and neither the parties nor the court would know which they did follow.

(Citation omitted.) Clearly, this Court in those cases refused to presume that error-free instructions were followed by the jury in arriving at its verdict. New trials were ordered.

My rejection of the rule is not based on favoring one side over the other since the contrary rule which I favor would require the reversal of a general verdict in favor of a defendant, as in *Zatkin v. Katz*, 126 Conn. 445, 11 A.2d 843 (1940) as well as when there is a general verdict in favor of a plaintiff, as in *Ohrmann v. Chicago & N.W. Railway Co.*, 223 Minn. 580, 27 N.W.2d 806 (1947). My position rests upon my belief that the rule adopted by the majority in the instant case allows too much laxity in the conduct of the trial. It could encourage enterprising counsel in cases where multiple causes of action are advanced or multiple defenses are interposed to risk error in one or more of them, knowing that as long as one is error-free, a general verdict in its favor will be sustained on appeal.

One of Squibb's major thrusts at the trial was to keep out of evidence the FDA mandated post-1972 package inserts under Rule 51, Utah Rules of Evidence. The trial court admitted them in support of plaintiff's cause of action for strict liability but excluded them with relation to the plaintiff's claim of negligence. Much of the testimony at the trial focused on the inserts. Their meaning and significance became a major issue. In denying a post-trial motion of Squibb, the trial judge com-

mented that this question of admissibility gave him the greatest problem in the conduct of the trial. Squibb now raises the propriety of the limited admission of the inserts as its principal point on appeal. Any system of justice worth its salt should be able to extend to a losing party who has been saddled with a judgment of $1.5 million the satisfaction of a review on the merits of the steps by which such a verdict and judgment was reached. To sidestep that task by the employment of a presumption which is flawed in logic is indefensible.