**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TRANS-WESTERN PETROLEUM, INC.,
a Colorado corporation,

     Plaintiff - Appellant,

v.

UNITED STATES GYPSUM CO., an
Illinois corporation,

     Defendant - Appellee.

No. 16-4187
(D.C. No. 2:06-CV-00801-TS)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **EBEL** and **LUCERO**, Circuit Judges.
_____

This contract dispute arises out of an oil and gas lease sold by United States

Gypsum Co. ("USG") to Trans-Western Petroleum, Inc. ("TWP"). TWP purchased

the lease with the intent to sell it and retain an interest in production. Before it could

do so, however, USG attempted to rescind the lease, and TWP responded by suing for

breach of contract. The district court concluded that USG had in fact breached the

lease, but found that TWP could not prove any damages with the necessary level of

certainty, and thus was not entitled to damages. We disagree. Exercising jurisdiction

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

under 28 U.S.C. § 1291, we reverse and remand on the conclusion that reasonable certainty was provided.

## I

In 2003, the Bureau of Land Management ("BLM") approved a portion of land in Sanpete and Sevier Counties, Utah, for oil and gas exploration. The land became known as the "Wolverine Unit" because the designated operator was Wolverine Gas and Oil Corporation ("Wolverine"). In 2004, Douglas Isern, the sole owner of TWP, began looking for opportunities to purchase a lease near the Wolverine Unit. He eventually ascertained that USG owned oil and gas underlying 1,720 acres of the Unit in Sevier County. USG had issued a lease, known as the "Armstrong Lease," for that acreage. Held by Wolverine, the lease was set to expire on August 17, 2004. Acting quickly, Isern purchased a new lease from USG—the "TWP Lease"—beginning immediately after the Armstrong Lease expired. TWP agreed to pay $32,680, or nineteen dollars per acre, for the lease. In keeping with its business plan, TWP intended to assign the lease to another party at some point during its five-year term, but retain an interest in the production, rather than developing the minerals itself. This practice of selling and reselling oil and gas leases is common in the industry, and the TWP Lease expressly allowed assignment.

But TWP would never get the chance to carry out this plan. On October 1, 2004, Isern received a letter from Wolverine, the prior lessee, claiming that its lease had been extended and thus the TWP Lease was invalid. On October 7, 2004, USG

2

sent a letter to TWP that purported to rescind the TWP lease based on Wolverine's position.

TWP brought suit against both Wolverine and USG. In December 2007, the district court granted TWP's request for a declaratory judgment against Wolverine, concluding that the Armstrong Lease had expired on August 17, 2004. The district court certified its decision for immediate appeal, and we affirmed. Trans-W. Petroleum, Inc. v. U.S. Gypsum Co., 584 F.3d 988, 994-95 (10th Cir. 2009). On remand, the court granted summary judgment in favor of TWP on its claims against USG for declaratory relief, breach of contract, and quiet possession.

The case proceeded to a bench trial on the issue of damages. TWP called three witnesses. First was an attorney named Bryan Farris, the president and co-owner of an oil and gas company who has participated in many oil and gas deals in Utah and the surrounding states. He testified that, because USG contested the validity of the TWP Lease, it was essentially unmarketable. However, Farris predicted that after the district court ruled against Wolverine, TWP could have sold the lease subject to a contingency regarding Wolverine's appeal. He opined that TWP would have been able to obtain at least $3,000 per acre, an estimate he based on public records of lease sales by the state and federal governments. Farris reached this conclusion by analyzing the condition of the market in the Wolverine Unit and then considering how the land covered by the TWP Lease fit into a larger body of data. He noted that the TWP Lease was unique because it was located in close proximity to oil that had already been discovered. And he identified nearby leases that sold for between

3

$2,700 and $3,000 per acre in 2006. Farris explained that by 2009, however, prices in the area collapsed due to changes in the oil and gas market and the drilling of a dry hole in the area.

Isern was the second witness. He testified that if USG had not breached, TWP would have owned "the premier lease" in the area at a time when leases were in high demand. Isern further testified that TWP would have "unquestionably" sold the lease in 2007 or 2008, when leases in inferior positions were selling for $3,000 per acre.

TWP's final witness was Philip Cook, a certified commercial real estate appraiser with experience in oil and gas leases. Cook provided an appraisal of the TWP Lease both before and after USG's breach, as well as an estimate of TWP's lost profits. He analyzed the data for sales of leases in the area surrounding the TWP Lease that occurred after January 23, 2008, a date he selected as the earliest possible date on which TWP could have sold the lease following the district court ruling against Wolverine. Cook concluded that TWP would have been able to sell the lease for $2,500 per acre at that time. He then analyzed the sales data in late 2009, after the market had suffered significantly, opining that TWP would have been able to sell the lease for only $2 per acre in that time frame. Cook estimated lost profits of nearly $4.5 million.

Although USG called two witnesses, neither offered an opinion as to the value of the TWP Lease. Christopher McElroy, assistant general counsel at USG, testified about the correspondence between USG and TWP. Robert Keach, a geophysicist

4

with extensive oil and gas experience, testified about the geology of the land covered by the TWP Lease without offering any opinion as to valuation.

Following trial, the district court concluded that TWP was not entitled to damages. As to lost profits, the district court held that TWP failed to demonstrate that it would have sold the lease in late 2007 or early 2008. It determined that although the value of the lease "peaked at about $4.5 million," TWP had not presented any evidence that it would have sold at this peak value, rather than selling at an earlier, lower price or holding on to the lease until after the market crashed. Thus, the court concluded, TWP had not met its burden of proof and could not collect any consequential damages. This appeal followed.

## II

In the context of a bench trial, we review a district court's factual findings for clear error and its legal conclusions de novo. Keys Youth Servs., Inc. v. City of Olathe, 248 F.3d 1267, 1274 (10th Cir. 2001). Under Utah law, a plaintiff may recover consequential damages following a breach of contract by proving: "(1) that consequential damages were caused by the contract breach; (2) that consequential damages ought to be allowed because they were foreseeable at the time the parties contracted; and (3) [that] the amount of consequential damages [can be determined] with[] a reasonable certainty." Mahmood v. Ross, 990 P.2d 933, 938 (Utah 1999). To establish lost profits with reasonable certainty, a plaintiff must submit evidence "of sufficient certainty that reasonable minds might believe from a preponderance of the evidence that the damages were actually suffered." Cook Assocs., Inc. v.

5

Warnick, 664 P.2d 1161, 1165 (Utah 1983) (quotation omitted). This standard applies to: "(1) the fact of lost profits, (2) causation of lost profits, and (3) the amount of lost profits." Id. And "only those damages which are the natural and reasonably foreseeable result of a breach of contract are recoverable." Tenneco Oil Co. v. Gaffney, 369 F.2d 306, 309 (10th Cir. 1966).

We conclude that TWP met its burden with respect to all four requirements for recovering lost profits under Utah law. First, TWP proved at trial that it did in fact lose profits as a result of USG's breach. See Cook Assocs., 664 P.2d at 1165. Farris testified that it is very uncommon for a lessor to breach an oil and gas lease, and that a sale by the lessee under those conditions would have been impossible. If USG had not breached, however, TWP "would have had the premier lease" in the area at a time when leases were in high demand. According to this evidence, TWP certainly lost profits. And there is no real dispute that USG's breach caused this loss, thus meeting the second requirement. See id.

The district court based its ruling on the third requirement—that TWP prove the amount of lost profits. It characterized TWP's damages argument as resting on the theory that TWP would have sold at the market's precise peak. On appeal, USG points to a statement by Isern that January 2008 was "sort of the peak of the oil and gas lease market." But the evidence does not suggest a narrow window of high prices. Isern's testimony was correct: 2007 and 2008 were a peak in the market, with prices rising above the levels seen in 2006 before falling again in 2009. The $2,500 per acre price, however, was a minimum estimated price during a broad time

6

frame.  As TWP's witnesses established, TWP would not have had to sell at any precise time to charge that price.  Two sales on which TWP relied, for $3,000 and $2,700 per acre, occurred in May 2006.  Two other sales, for $7,300 and $15,000 per acre, occurred in August 2008.  And Isern testified that he would have sold "sometime in 2008 [or] 2007."

Further, unlike the period at issue in <u>Tenneco Oil</u>, a case upon which the district court relied, the late 2007 to early 2008 period on which the parties in this case focused was not plucked from thin air.  <u>See</u> 369 F.2d at 309 (rejecting lost profits calculation based on "pure speculation" that the plaintiff would have sold at a particular time).  In December 2007, the district court ruled that Wolverine's alleged lease extension had not occurred.  Even absent USG's breach, TWP would not have had to remain steadfast in refusing to sell prior to 2007 because the Wolverine litigation was a major obstacle to sale.[1]  Nor would TWP have waited much longer to sell after that ruling.  The TWP Lease, by its terms, expired in 2009.  As Isern testified, a lease becomes far less marketable within a year of its termination date.  These external factors—Wolverine's challenge to the lease and the lease's own termination date—would have strongly influenced TWP to sell at a time when the market was strong.

All three of USG's witnesses testified that the lease would have fetched at least $2,500 per acre if it could have been sold in that period.  Cook provided the

---

[1] Farris acknowledged that the decision was appealed, but testified that the lease could be sold subject to a contingency regarding the appeal.

lowest valuation, $2,500 per acre, which would have resulted in $4,829,151 in lost profits. USG retained an expert to refute this testimony, but declined to call him as a witness during trial or otherwise dispute TWP's figure. Our precedent clearly establishes that "[d]amages need not be proved with such preciseness as to permit a jury to reach a verdict with mathematical certainty. An approximation is sufficient if there is substantial evidence which, together with the reasonable inference to be drawn therefrom provides a reasonable basis of computation." Brown v. Alkire, 295 F.2d 411, 416 (10th Cir. 1961). We conclude that TWP met its burden of establishing lost profits with reasonable certainty.

Finally, TWP demonstrated that these lost profits were a reasonably foreseeable result of USG's breach. See Cook Assocs., 664 P.2d at 1165. As Isern testified, TWP's plan when it secured the lease was to resell it for a profit. And the TWP Lease explicitly gave them the right to do so. USG then attempted to rescind the lease, even after the district court determined in 2007 that Wolverine had no right to it in an industry in which a seller's breach would prevent a resale. USG's breach thus foreseeably deprived TWP of their expected benefit from the lease.

### III

The order of the district court denying TWP any consequential damages is **REVERSED**. We **REMAND** with instructions to award consequential damages for lost profits in the amount of $4,829,151. TWP's motion for leave to file a

supplemental appendix is **GRANTED**.

Entered for the Court


Carlos F. Lucero
Circuit Judge

16-4187, *Trans-Western Petroleum, Inc. v. U.S. Gypsum Co.*,

**TYMKOVICH**, C.J., dissenting.

I think the "clear error" standard of review compels us to affirm the decision of the district court.

Under Utah law, the fact-finder's determination that the consequential damages a party sought were not "reasonably certain" is a question of fact. *See, e.g.*, *Sawyers v. FMA Leasing Co.*, 722 P.2d 773, 774 (Utah 1986) ("Plaintiff, of course, has the burden to produce a sufficient evidentiary basis to establish the fact of damages and to permit the trier of fact to determine with *reasonable certainty* the amount of lost net profits.") (emphasis added). And when a party appeals from a bench trial, we review the district court's factual findings for clear error. *See, e.g.*, *Leathers v. Leathers*, 856 F.3d 729, 762 (10th Cir. 2017); *see also* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

Clear-error review is, of course, a high bar for Trans-Western to overcome. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985). "To reverse under [the clear-error] standard requires that, based on the entire

evidence, we have a 'definite and firm conviction that a mistake has been committed.'" *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1221 (10th Cir. 2007) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)). As a result, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *City of Bessemer*, 470 U.S. at 574.

The "reasonable certainty" of consequential damages is an area of the law that leaves much to the discretion of the fact-finder. As Judge Cardozo explained long ago, "[n]o formula can be framed, regardless of experience, to tell us in advance when approximate certainty may be attained. The rule of damages must give true expression to the realities of life." *Broadway Photoplay Co. v. World Film Corp.*, 121 N.E. 756, 757 (N.Y. 1919).

Given the highly deferential standard of review—and the essentially discretionary legal standard—nothing in the record convinces me the district court's assessment of the valuation's certainty was less than plausible. To be sure, Trans-Western *could* have made large profits by assigning the lease when the market was hot. But it is by no means "certain" it *would* have—or how much those profits would have been. Speculating in oil and gas leases is a risky business, as much art as science in deciding when exactly to sell. The district court thought it could not be "reasonably certain" when and whether Trans-Western would have sold. In the court's view, Trans-Western failed to prove that it would have been able to foresee the "hot" market, that it would have held onto

-2-

the lease until the time when the market was hot, or that it would have received an offer at a price it was willing to accept. That finding falls within the district court's purview.

Neither did Trans-Western need to adopt such a bold strategy. Indeed, it had more conservative options available. For instance, presenting a moving average of one or more similar assets over the time period at issue might have mitigated uncertainty over the date of sale. Or Trans-Western could have discounted its desired sale figure to adjust for hindsight bias. Maybe the district court would have accepted an argument that Trans-Western would have sold at $100 an acre, rather than $2,500. But Trans-Western aimed for a higher award—a higher-risk approach—and it just did not work.

Finally, the majority points to U.S. Gypsum's failure to put on evidence. But U.S. Gypsum decided its best defense was arguing the damages were too speculative to be awarded. That is a strategy best advanced by cross-examining the plaintiff's witness, rather than providing clues in a rebuttal case that might give Trans-Western an idea on how to bolster its case for a higher valuation.

I would therefore affirm the district court under the clear-error standard of review.