2008 UT App 105

**HI–COUNTRY ESTATES HOME-OWNERS ASSOCIATION, a Utah corporation, Plaintiff,**

v.

**BAGLEY & COMPANY, a Utah corporation; J. Rodney Dansie; and Gerald Bagley, Defendants.**

**Foothills Water Company, a Utah corporation; J. Rodney Dansie; The Dansie Family Trust; Richard P. Dansie; Boyd W. Dansie; Joyce M. Taylor; and Bonnie R. Parkin, Counterclaimants, Appellants, and Cross-appellees,**

v.

**Hi–Country Estates Homeowners Association, a Utah corporation, Counterclaim Defendants, Appellees, and Cross-appellants.**

No. 20060139–CA.

Court of Appeals of Utah.

March 27, 2008.

Rehearing Denied April 28, 2008.

Raymond J. Etcheverry and Angie Nelson, Salt Lake City, for Appellants and Cross-appellees.

Dale F. Gardiner, Salt Lake City, for Appellees and Cross-appellants.

Before THORNE, Associate P.J., DAVIS and ORME, JJ.

## OPINION

DAVIS, Judge:

¶ 1 Counterclaimants Foothills Water Company, J. Rodney Dansie, the Dansie Family Trust, Richard P. Dansie, Boyd W. Dansie, Joyce M. Taylor, and Bonnie R. Parkin (the Dansies) appeal several of the trial court's determinations. Counterclaim Defendant Hi–Country Estates Homeowners Association (the Association) filed a cross-appeal challenging other determinations. We affirm.

## BACKGROUND [1]

¶ 2 This case revolves around a water system that supplies water to the Hi–Country Estates Subdivision. From 1973 to 1985, Gerald Bagley operated and made improvements to the water system, first in his capacity as an individual, then as a partner of Bagley and Company, and finally as a principal of Foothills Water Company (Foothills). In 1977, Bagley, apparently in his individual capacity, and Jesse Dansie entered into a well lease agreement (the Well Lease), which allowed Bagley to connect the water system to Dansie's well and draw water from Dansie's well for a ten-year period. Water lines were installed to transfer the water from the well to the water system, as well as to transport water to property owned by Dansie. As part of the Well Lease, Dansie had the right to receive water from the water system at no cost through five residential hook-ups, and the right to receive up to fifty additional hook-ups at no cost. The Well Lease was amended in July 1985, giving Dansie the right to receive up to twelve million gallons of water per year from the water system at no cost for as long as the system was operable.

---

1. The history of this case is extensive. We relate only those facts pertinent to the issues currently before us. For a more detailed recital see *Hi-Country Estates Homeowners Association v. Bag-* *ley & Co.*, 928 P.2d 1047, 1048–50 (Utah Ct.App. 1996), and *Hi–Country Estates Homeowners Association v. Bagley & Co.*, 863 P.2d 1, 2–7 (Utah Ct.App.1993), *rev'd*, 901 P.2d 1017 (Utah 1995).

¶ 3 This protracted litigation began in March 1985, with the Association bringing an action to quiet title in the water system against Bagley, Bagley and Company, and Dansie. Bagley counterclaimed under an unjust enrichment theory for reimbursement of costs related to the operation and maintenance of the water system, should title to the water system be quieted in the Association. Defendants also counterclaimed for enforcement of the Well Lease.

¶ 4 In June 1985, Bagley created Foothills and began to manage the water system through this entity. Toward the end of the year, Bagley transferred all interest and stock in Foothills to Dansie; and the following January, Bagley assigned to Foothills all of his rights related to the water system. Also in June 1985, Foothills applied to the Public Service Commission (the PSC) to operate the water system as a public utility; and the PSC granted a certificate of convenience and necessity. The following year, the PSC held rate-setting hearings and determined that, notwithstanding the terms of the Well Lease, in order for the Dansies to obtain their free water, they would need to pay the pro-rata costs for power, chlorination, and water testing.

¶ 5 Title in the water system was eventually quieted in the Association. In 1994, shortly after the Association assumed control of the water system, the Association disconnected the water lines to the Dansie property when the Dansies allegedly refused to pay the costs required by the 1986 PSC order. The Dansies thereafter built a temporary water system to service their property and claimed breach of contract based on the severance of the water systems. In 1996, the PSC revoked the water system's status as a public utility.

¶ 6 After nearly twenty years of district court determinations, appeals by the parties, and remands by appellate courts, trial on the remaining issues was held in early 2005. The trial court then issued a Final Judgment on those remaining issues on January 5, 2006, which (1) ruled that the Well Lease was an enforceable contract and was not, as the Association had argued, void because of public policy or unconscionability; (2) dismissed the Dansies' breach of contract claims because the Dansies refused to pay the costs set forth by the 1986 PSC order and because the Dansies had failed to prove damages that were proximately caused by the separation of the water systems or to mitigate their alleged damages; and (3) refused to award attorney fees the Dansies claimed under the terms of the Well Lease. A separate order was signed on the same day, fixing an award amount of $16,334.99 to Foothills for improvements made to the water system between the years 1981 and 1985, the court having previously determined in a separate memorandum decision that Foothills was entitled to such an award.

¶ 7 The Dansies appeal the dismissal of their breach of contract claims, arguing that they did offer to pay the necessary costs and that they did prove damages caused by the severing of the water systems. Further, the Dansies argue that the trial court should have granted them attorney fees under the terms of the Well Lease. The Association cross-appeals, arguing that the Well Lease is not enforceable because of public policy concerns and the doctrine of unconscionability. The Association also appeals the amount awarded to the Dansies as reimbursement for improvements, arguing that the trial court incorrectly relied on a prior PSC finding in determining that amount.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 8 The Association argues that the Well Lease is void as against public policy and that it is also unconscionable. These are legal questions, which we review for correctness, giving no deference to the trial court's determination on the matters. *See Sosa v. Paulos*, 924 P.2d 357, 360 (Utah 1996) ("The determination of whether a contract is unconscionable is ... a question of law for the court." (citing *Resource Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1041 (Utah 1985))); *Russ v. Woodside Homes, Inc.*, 905 P.2d 901, 904, 906–07 (Utah Ct.App. 1995) (reviewing for correctness the question of whether a contract provision was void because it violated public policy).

■ ¶ 9 The Dansies contest the trial court's determinations that the Association did not breach the Well Lease and that, in any event, the Dansies did not prove any damages that were proximately caused by the alleged breach. Our analysis focuses on the damages determination, which is a question of fact reviewed under a clear error standard. *See Judd ex rel. Montgomery v. Drezga,* 2004 UT 91, ¶ 34, 103 P.3d 135 (recognizing that "damages are a question of fact"); *State v. Pena,* 869 P.2d 932, 935 (Utah 1994) ("Trial courts are given primary responsibility for making determinations of fact. Findings of fact are reviewed by an appellate court under the clearly erroneous standard.").

¶ 10 The Association also contests the amount awarded to the Dansies as reimbursement for improvements made to the water system, essentially arguing that a finding in the 1986 PSC order is insufficient evidence to support the amount of the trial court's award. "When an appellant is essentially challenging the legal sufficiency of the evidence, a clearly erroneous standard of appellate review applies.... We review the evidence in a light most favorable to the trial court's findings and affirm if there is a reasonable basis for doing so." *Reinbold v. Utah Fun Shares,* 850 P.2d 487, 489 (Utah Ct.App.1993).

■ ¶ 11 Finally, the Dansies contest the trial court's refusal to award attorney fees under the terms of the Well Lease. "Whether a party may recover attorney fees in an action is a question of law that we review for correctness." *Ault v. Holden,* 2002 UT 33, ¶ 46, 44 P.3d 781 (citing *Warner v. DMG Color, Inc.,* 2000 UT 102, ¶ 21, 20 P.3d 868).

## ANALYSIS

### I. Public Policy

■ ¶ 12 The Association argues that the Well Lease is void as a matter of public policy. Specifically, the Association argues that the provisions for free water and water connections violate "the public policy that a water company may not charge unreasonable, preferential, or discriminatory rates." As support for this argument, the Association points to sections of the Utah Code providing that charges by a public utility be "just and reasonable," Utah Code Ann. § 54–3–1 (2000), and that a public utility may not be preferential in its treatment of persons and entities, *see id.* § 54–3–8(1) (Supp.2007). The Association further relies on the 1986 PSC order, arguing that the order determined the Well Lease to be " 'grossly unreasonable.' " But the Association is no longer a public utility, and thus, neither these statutes nor the PSC order is currently applicable to the Association.[2] And we do not see any indication that the public policy regarding the operation of public utilities should extend to agreements between private parties contracting for water service.

■ ¶ 13 The Association also argues that the Well Lease violates "the public policy that the state's scarce water resources should be managed by public entities." In

---

**2.** In addressing the breach of contract claims, the trial court determined that the Association was required to provide the water "only upon payment of [the Dansies'] pro rata share of the Association's cost for power, chlorination, and water testing," and that the Association was required to provide the water connections "only if [the Dansies] pa[id] the Association for those connections at the Association's usual charge for such connection." The court reasoned that such payment by the Dansies was required because "[t]he 1986 PSC Order prohibits the Well Lease from affecting the rates paid by ... the association members."

On February 5, 1996, the PSC revoked the status of the water system as a public utility. Therefore, from that point forward, the PSC did not have jurisdiction over the water system, *see* Utah Code Ann. § 54–4–1 (2000), and the 1986

PSC order was no longer binding. Thus, we now interpret the Dansies' rights and obligations under the Well Lease according to its plain language, which, as amended, states:

Dansie shall have the right to receive up to five (5) residential hook-ups on to the water system on the Dansie property for members of his immediate family without any payment of hook-up fees and shall further have the right to receive up to 12 million (12,000,000) gallons of water per year from the combined water system at no cost for culinary and yard irrigation use....

The Well Lease also provides: "Dansie shall further have the right to receive up to fifty (50) residential hook-ups onto the water system on the Dansie property for which no hook-up fees will be charged."

support, the Association points to the Utah Constitution, which gives municipalities the power to purchase or lease public utilities, *see* Utah Const. art. XI, § 5(b), as well as section 17A–2–1401(7)(d) of the Utah Code, which states the policies of water conservancy districts, *see* Utah Code Ann. § 17A–2–1401(7)(d) (2004) (repealed 2007). The Association argues that the Well Lease, specifically the Dansies' right of refusal, violates these policies because it prohibits the Association from turning its water system over to a governmental entity. Again, neither of these sources show a public policy to prevent the type of private contract entered into here. Instead, such contracts can harmoniously coexist with these constitutional and statutory provisions without frustrating public policy. Thus, considerations of public policy do not render the Well Lease void.

## II. Unconscionability

■ ¶ 14 The Association argues that the Well Lease is also void due to unconscionability. The basis for this argument is the Well Lease provisions for perpetual free water and water connections. But "[e]ven if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable—the terms must be 'so one-sided as to oppress ... an innocent party.'" *Ryan v. Dan's Food Stores, Inc.,* 972 P.2d 395, 402 (Utah 1998) (quoting *Sosa v. Paulos,* 924 P.2d 357, 361 (Utah 1996)).

■ ¶ 15 Nearly all of the Association's arguments center on the alleged current values of the obligations and benefits under the Well Lease. However, while not suggesting that the current circumstances would support a different result, our focus is on the time at which the Well Lease was initially entered into. *See Resource Mgmt. Co. v. Weston Ranch & Livestock Co.,* 706 P.2d 1028, 1043 (Utah 1985) ("Ordinarily the fairness of a contract should be determined in light of the circumstances as they existed at the time of the making.... Unconscionability cannot be demonstrated by hindsight." (internal quotation marks omitted)); *Bekins Bar v. Ranch v. Huth,* 664 P.2d 455, 461 (Utah 1983) ("The determination of whether a contract is unconscionable is usually made with respect to the conditions that existed at the time the contract was made, and without regard for the parties' subsequent conduct and dealings."). The Association's only argument concerning the circumstances in 1977 is that the Association did not need water from the Dansie well. But the Association concedes that at the time the Well Lease was entered into, Bagley and Dansie had plans for a future subdivision, which may have been the primary reason for the Well Lease. Thus, Bagley did receive a potentially valuable benefit under the contract and, without more facts regarding the circumstances in 1977, we cannot say there is necessarily "an overall imbalance in the obligations and rights imposed by the bargain"[3] or that the terms are "so one-sided as to oppress or unfairly surprise an innocent party." *Bekins Bar v. Ranch,* 664 P.2d at 462 (internal quotation marks omitted). Thus, we decline to declare the Well Lease void due to unconscionability.[4]

---

**3.** An imbalance in the obligations and rights of the parties is only one factor to be used in determining unconscionability. *See Bekins Bar v. Ranch v. Huth,* 664 P.2d 455, 461–62 (Utah 1983). A simple imbalance in the contract terms, without more, does not invalidate a contract. *See id.* at 459 ("With a few exceptions, it is still axiomatic in contract law that persons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts for the purpose of relieving one side or the other from the effects of a bad bargain. Parties should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side." (citation and internal quotation marks omitted)).

**4.** The Association also argues that the Well Lease is unconscionable as applied to it because it was never a party to the Well Lease and is not a successor or an assign of Bagley. Although we see nothing in the record to indicate that the Association was ever a party to the Well Lease, the Association has failed to preserve this argument. We have reviewed the record references supplied by the Association, but we see no place where this argument was preserved. *See State v. Brown,* 856 P.2d 358, 361 (Utah Ct.App.1993) ("Utah courts require specific objections in order to bring all claimed errors to the trial court's attention to give the court an opportunity to correct the errors if appropriate.... An oblique reference to an issue in the absence of an objection to the trial court's failure to rule on the issue does not put that issue properly before the

## III. Breach of the Well Lease

¶ 16 The Dansies allege that the trial court erred by dismissing their breach of contract claims, which were based on the Association severing the two water systems. In dismissing the claims, the trial court relied on the 1986 PSC order—the Association was a public utility and the PSC did have jurisdiction over the Association at the time the alleged breach occurred—and determined that because the Dansies had refused to pay the required fees, the Association did not breach its obligations under the Well Lease by severing the water systems. The court further determined that the Dansies had failed to prove damages proximately caused by the alleged breach. We affirm the dismissal of the breach of contract claims based on this failure to prove damages.

¶ 17 The trial court determined: "The Dansies failed to prove any damages proximately caused by the separation of the two water systems. The Dansies further failed to mitigate any other alleged damages." This determination was based on findings that (1) "[t]he Dansies had several water sources to draw from when the Association disconnected its water system"; (2) "[t]he Dansies allowed their Lot 51 orchard to die from lack of watering"; (3) "[t]he Dansies did not lose money on the East 80 property as a result of the Association's disconnection from its water system"; (4) "[n]o Dansies lost landscaping as a result of the Association's disconnection from it[s] water system to the Dansies"; and (5) the Dansies refused offers from Herriman Pipeline Company and Kennecott to serve the Dansies' lands. The Dansies do not argue that the findings do not support the trial court's conclusion but, instead, argue that the record evidence does not support these findings.

¶ 18 "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a). " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *State v. Walker,* 743 P.2d 191, 193 (Utah 1987) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

¶ 19 The Dansies' argument regarding damages essentially reargues the facts that were before the trial court. "However, a party challenging a trial court's factual finding must do more than merely reargue the evidence supporting his or her position; rather, the party is required to first marshal the evidence in support of the finding." *Sigg v. Sigg,* 905 P.2d 908, 913 n. 7 (Utah Ct.App. 1995) (citing *Shepherd v. Shepherd,* 876 P.2d 429, 432 (Utah Ct.App.1994)); *see also Reid v. Mutual of Omaha Ins. Co.,* 776 P.2d 896, 899 (Utah 1989) ("To mount a successful challenge to the correctness of a trial court's findings of fact, an appellant must first marshal all the evidence supporting the finding and then demonstrate that the evidence is legally insufficient to support the findings even in viewing it in the light most favorable to the court below.").

> The process of marshaling is ... fundamentally different from that of presenting the evidence at trial. The challenging party must temporarily remove its own prejudices and fully embrace the adversary's position; [the challenging party] must play the devil's advocate. In so doing, appellants must present the evidence in a light most favorable to the trial court and not attempt to construe the evidence in a light favorable to their case. Appellants cannot merely present carefully selected facts and excerpts from the record in support of their position. Nor can they simply restate or review evidence that points to an alternate finding or a finding contrary to the trial court's finding of fact.

*Chen v. Stewart,* 2004 UT 82, ¶ 78, 100 P.3d 1177 (citations and internal quotation marks omitted).

¶ 20 In their brief, the Dansies simply set forth the evidence supporting their position, provide the opposition's response to that evi-

---

court." (citations and internal quotation marks omitted)). Further, the Association has not ar-

gued any exception to this rule. Thus, we cannot consider this argument in our decision.

dence, and argue that the latter was not credible. Such does not meet the "rigorous and strict" marshaling requirement. *Id.* ¶ 79. Further, the determination of credibility is for the fact finder, and our review on appeal is much more limited. *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 75, 99 P.3d 801 ("When reviewing a district court's findings of fact on appeal, we do not undertake an independent assessment of the evidence presented during the course of trial and reach our own separate findings with respect to that evidence. Rather, we endeavor only to evaluate whether the court's findings are so lacking in support that they are against the clear weight of the evidence."). Thus, because the Dansies do not adequately marshal the evidence, we affirm the trial court's findings and conclusions regarding failure to prove damages proximately caused by the alleged breach, *see Chen*, 2004 UT 82, ¶ 80, 100 P.3d 1177, and we therefore affirm the dismissal of the breach of contract claims, *see Eleopulos v. McFarland & Hullinger, LLC*, 2006 UT App 352, ¶ 10, 145 P.3d 1157 ("A breach of contract claim requires four essential elements of proof, one of which is damages.").[5]

## IV. Improvements to the Water System

 ¶ 21 In one short paragraph, the Association argues that the trial court erred in relying exclusively on the 1986 PSC order's calculation of "rate base" to determine the amount to be awarded to the Dansies for improvements made to the water system. The Association claims that deficiencies in the order make it insufficient evidence to support the award amount. First, the Association asserts that it is not clear that the figure of $16,334.99 reached by the PSC was confined to the correct time period–1981 through 1985. But the PSC order is amply clear on this point, stating that "all improvements ... prior to 1981[we]re not includeable [sic] in the rate base" and then prefacing the calculation of rate base with the language

"For improvements made from 1981–1985, we find as follows." Second, the Association asserts that "it is not certain ... whether Foothills recovered some or all of the improvements through water rates." But the Association points to no evidence presented below that would indicate that the order's figure was in any way incorrect or that a portion of the amount was recovered through water rates. The PSC order was, as the trial court noted, "the only credible evidence before the court." Thus, although the order was not binding on the court, *see supra* note 2, the court was free to use the order as *evidence* of the value of the improvements, and the content of the order was therefore sufficient to support the amount awarded. Hence, we affirm the amount awarded as reimbursement for improvements.

## V. Attorney Fees

¶ 22 The Well Lease contains an indemnification provision, which states:

> Bagley agrees for himself, his successors, and assigns to be responsible for and to indemnify Dansie, his successors and assigns, against any and all liability, losses and damages, of any nature whatever, and charges and expenses, including court costs and attorney[ ] fees that Dansie may sustain or be put to and which arise out of the operations, rights and obligations of Bagley pursuant to this Agreement whether such liability, loss, damage charges or expenses are the result of the actions or omissions of Bagley, his employees, agents or otherwise.

The Dansies argue that because they succeeded in obtaining an award for reimbursement for improvements as well as a ruling that the Well Lease is an enforceable contract, the trial court should have awarded them attorney fees under the indemnification

---

5. Moreover, the Dansies do not directly address the trial court's finding regarding their failure to mitigate, i.e., that other entities had offered to service the Dansies' property. This is another ground for affirmance. *See generally Mahmood v. Ross (In re Estate of Ross)*, 1999 UT 104, ¶ 31, 990 P.2d 933 ("[U]nder the doctrine of avoidable consequences the nonbreaching party has an active duty to mitigate his damages, and he 'may not, either by action or inaction, aggravate the injury occasioned by the breach.' " (quoting *Utah Farm Prod. Credit Ass'n v. Cox*, 627 P.2d 62, 64 (Utah 1981))).

clause of the Well Lease.[6] We disagree.

¶ 23 We will award attorney fees under the indemnity clause of the Well Lease only to the extent authorized in the Well Lease, i.e., those attorney fees that "arise out of" obligations "pursuant to" the Well Lease. It appears from the record, and the Dansies point to nothing indicating otherwise, that the amount for reimbursement of improvements was awarded under an unjust enrichment claim and did not arise out of rights or obligations pursuant to the Well Lease. And notwithstanding the trial court's determination that the Well Lease was an enforceable contract, the Dansies were ultimately unsuccessful on their breach of contract claims based thereon. Therefore, we affirm the trial court's refusal to award attorney fees under the indemnification clause of the Well Lease, and we accordingly decline to award attorney fees incurred on appeal.

## CONCLUSION

¶ 24 We affirm the trial court's holding that the Well Lease is an enforceable contract, being neither void as against public policy nor unconscionable. We further af-

firm the dismissal of the Dansies' breach of contract claims; specifically, we affirm the trial court's determination that the Dansies did not prove damages proximately caused by the separation of the water systems. As to the issue regarding the amount awarded as reimbursement for improvements, we see no error in the trial court's reliance on the PSC finding and affirm this award. Finally, because the Dansies did not ultimately prevail on their breach of contract claims and because their claim for reimbursement was not brought under the Well Lease, attorney fees are not appropriate below or on appeal. We therefore affirm the trial court on all issues.

¶ 25 WE CONCUR: WILLIAM A. THORNE JR., Associate Presiding Judge, and GREGORY K. ORME, Judge.

---

6. The Association primarily argues that attorney fees are inappropriate under the Well Lease because it is not a "successor" or an "assign" of Bagley. But as we have noted above, *see supra* note 4, this argument was not preserved below and we will not now reach it on appeal.