2014 UT App 15

**Michael AUSTIN and Wanda Austin,
Plaintiffs and Appellants,**

v.

**Jon BINGHAM and Adree Bingham,
Defendants and Appellees.**

No. 20120765–CA.

Court of Appeals of Utah.

Jan. 24, 2014.

Paul H. Tsosie, West Jordan, for Appellants.

Gayle F. McKeachnie, Vernal, Michael D. Zimmerman, Troy L. Booher, and Clemens A. Landau, Salt Lake City, for Appellees.

Judge STEPHEN L. ROTH authored this Memorandum Decision, in which Judge JAMES Z. DAVIS and Senior Judge RUSSELL W. BENCH concurred.[1]

Memorandum Decision

ROTH, Judge:

¶ 1 Michael and Wanda Austin appeal from certain portions of a damages award in favor of Jon and Adree Bingham. We affirm and remand to the trial court for calculation of the attorney fees that the Binghams incurred on appeal.

¶ 2 The Austins and the Binghams are neighbors in rural Neola, Utah. The Binghams have a private right-of-way to access their residence over the Austins' property. That right-of-way has existed for over thirty years, and during much of that time, it was the only access to the Bingham parcel.[2] The right-of-way runs from the county road past the Austins' home and then through the Austins' and another neighbor's pasture to the Bingham parcel. Previous owners built a rudimentary road over the right-of-way, using culverts and gravel to make it passable, but the road is by all other appearances pasture land. In the spring of 2007, Jon Bingham built a fence along the south side of the right-of-way to allow the Austins to graze cattle without "the need to open and close

---

1. The Honorable Russell W. Bench, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah Code Jud. Admin. R. 11–201(6).

2. The Austin and Bingham parcels were originally one parcel, but in 1975, the title was split and the right-of-way was created. The Austins have resided on their parcel since 1985. The Binghams moved into the home on their parcel in 2007. Prior to the Binghams' ownership, no one had resided on the Bingham parcel for more than sixteen years.

gates as people accessed the Bingham property." The Binghams also plowed the right-of-way to keep it accessible during the winters of 2007 and 2008. Until late 2008, the Binghams' use of the right-of-way was uneventful, except for a few occasions when Mr. Austin stopped Mr. Bingham to complain that people were speeding on the right-of-way.

¶ 3 In January 2009, things changed dramatically. The Austins started interfering with the Binghams' use of the right-of-way by closing the barbed wire gates. There were three gates along the right-of-way: one at the county road, one at the beginning of the pasture near the Austins' home, and one at the end of the Austins' pasture. To open these gates, a person using the right-of-way would have to exit his or her vehicle and unloop the barbed wire from a fence post. On the first day that the Austins closed the gates, Mrs. Austin called the Binghams, "quite upset" and "yelling" that the Austins had "warned [the Binghams] that [they] were going to close [the] gates" if the speeding on the right-of-way road continued. When Mr. Bingham explained to Mrs. Austin that closing the gates was unacceptable because Mrs. Bingham and many of the Binghams' guests would be unable to open the gates, Mrs. Austin said, "Well, that's not my problem" and hung up the phone. The Austins soon began routinely closing the gates after each person drove down the right-of-way and insisted that the Binghams and their guests do the same. The Austins' demands were often accompanied by shouted profanities. The Binghams declined to close the gates, however, and the dispute soon escalated.

¶ 4 Whenever the Binghams traveled the right-of-way, the Austins would follow "right on [their] bumper ... shutting the gates." If Mrs. Bingham arrived at the gate while the Austins were in the process of closing it, she would have to wait until they closed the gate and then exit her vehicle to reopen it. The Austins also began tightening the barbed wire strands, making the gates increasingly more difficult to open because opening each gate required pulling the gate post against the tension of the barbed-wire gate strands in order to disengage the top of the gate post from the wire loop that secured it to the adjacent fence post. The difficulty was further complicated by the gates' placement over metal cattle guards, which required "stand[ing] on slippery bars" while unlooping the wire gate from the fence post. Mrs. Bingham and female guests often scraped their hands and tore their clothing while struggling with the fence. Once, when Mrs. Bingham was unable to open the middle gate, Mr. Austin locked the first gate behind her and left, stranding her in the pasture. On another occasion, the Austins used baling twine to knot a gate shut, and Mr. Bingham had to cut the twine in order to get the gate open. Later, the Austins installed panels that latched to the wire gates and used bicycle combination locks to secure them. Those locks were difficult to open in the dark and often froze in the winter.

¶ 5 In March 2009, a visiting friend and her children were trying to get to the Bingham property when Mr. Austin came out of the house and physically blocked the friend from opening the gate. Mrs. Bingham, accompanied by her two young children, went down to intervene. By the time she arrived, Mrs. Bingham's friend and her children were crying. Mr. Austin "started yelling" at Mrs. Bingham and said "he was not going to let [the friend] through" because she was not "us[ing] this right-of-way correctly." Mr. Austin continued yelling and was "obviously very, very angry," so Mrs. Bingham called the police.

¶ 6 Angry confrontations became more and more frequent. A neighbor testified that he and his wife were traveling the right-of-way after picking up their children from the Bingham house when Mrs. Austin "came to the window yelling profanity." The neighbor later returned to the Austins' house to talk with them about their behavior, and Mr. Austin chased him off the porch, threatening to beat him. At that point, the neighbor testified, Mr. Austin told him that the Austins' actions were intended to "get under [the Binghams'] skin" and that Mr. Austin "would get Johnny [Bingham]" by "hid[ing] behind the tree ... and ... knock[ing] him." Another neighbor reported that on a cold, wet spring day, he struggled with the combina-

tion lock for four or five minutes before simply removing a gate post to open one of the gates. The neighbor testified that Mr. Austin approached him "irate, ... yelling at me, cursing, asking me what I was doing to his gate." When the neighbor retreated to his vehicle, Mr. Austin pressed "his face right [into the] passenger truck window," yelling profanities at him until the neighbor drove away. Mrs. Bingham testified that the Austins would often confront the Binghams as well while they opened the gates. On at least one occasion, Mrs. Austin informed Mrs. Bingham that the Binghams could only blame themselves for the behavior because "you kids are the one[s] that started it."

¶ 7 During this same time period, the Austins also prohibited the Binghams from maintaining the right-of-way. On one occasion, Mrs. Austin stood in the middle of the road and refused to move until the plowing ceased. She ordered the Binghams to "not plow this road again." On another occasion, Mr. Bingham was filling in some of the deeper ruts in the road when Mr. Austin came out yelling that Mr. Bingham had "no right" to repair the road and demanding that Mr. Bingham leave before "I tear this whole thing up."

¶ 8 Mrs. Bingham testified that she thought that Mrs. Austin "hasn't liked us there" because "the road [has been] used on a regular basis" since the Binghams moved onto the parcel. Mrs. Bingham further testified that she felt threatened by the Austins' conduct and that on at least one occasion, she had called a sheriff to escort her and her children back to her house after a confrontation with Mr. Austin at one of the gates on the right-of-way. Eventually, Mrs. Bingham sought medical treatment for the stress and anxiety produced by the dispute.

¶ 9 As the dispute escalated, the Binghams proposed several alternatives to closing the gates, including improving the cattle guards to make them effective at keeping the cattle in pasture, installing an automatic gate, and building a privacy fence between the right-of-way and the Austins' home. Although the Binghams offered to undertake these improvements at their own expense, the Austins rejected all of the proposals. Around this time, "[o]ut of concerns for safety," a neighbor granted the Binghams permission to access their property through his pasture. Mr. Bingham installed a fence and culverts to make a passable lane, but this alternative route was difficult to traverse, hard on vehicles at best and unusable in wet conditions.

¶ 10 The Austins commenced legal action against the Binghams in June 2009. The Binghams counterclaimed, seeking compensatory and punitive damages for the additional costs, distress, inconvenience, and humiliation resulting from the Austins' interference with their use of the right-of-way. The trial court entered temporary orders to govern the right-of-way pending trial. Among other things, these orders directed the Austins to leave the pasture gates open, except on Wednesdays and Fridays when they were permitted to graze cattle on the right-of-way, and instructed the Binghams to take certain steps to make the cattle guards along the right-of-way functional. Despite the court's orders and the Binghams' compliance with their obligation, the Austins continued to close the right-of-way gates. They also told the court at trial that they would continue to close the gates even if the court ordered them to leave them open after trial.

¶ 11 After hearing the evidence at a bench trial in June 2012, the trial court found "that the Binghams' version of the facts [about the right-of-way dispute] is more credible." Accordingly, the trial court dismissed the Austins' claims and awarded the Binghams $109,591 in damages, including punitive damages and attorney fees. The trial court awarded the Binghams $20,000 in punitive damages as a consequence of the Austins' "willful and malicious actions interfering with [the Binghams'] use of the right-of-way[,] their harassment ... [of] persons attempting to enter and leave the Binghams' home[,] and their repeated refusal to obey the temporary orders entered in this case." The court awarded the Binghams all $48,897 of their attorney fees because the Austins' claims and their defenses to the Binghams' suit lacked merit and were brought in bad faith. The Austins now appeal the factual findings supporting four of the components of the damages award, totaling $30,600: $3,000 for Mrs. Bingham's medical treatment, $7,000 for Mr.

Bingham's inconvenience in using the right-of-way, $8,600 for the Binghams' improvement of the alternative entrance, and $12,000 for Mrs. Bingham's additional time and travel on the alternative route. The Austins do not appeal the award of punitive damages or bad faith attorney fees, nor do they challenge the trial court's stated basis for either award. The Binghams request their attorney fees incurred on appeal.

### I. $3,000 in Medical Expenses

¶ 12 The Austins argue that the trial court clearly erred in finding that "Mrs. Bingham requir[ed] medical services and medication costing $3,000" to cope with the stress and anxiety resulting from the right-of-way dispute. Appellate courts "shall not . . . set aside [a finding of fact] unless clearly erroneous," Utah R. Civ. P. 52(a), and the Austins appear to take the position here that "the finding is without adequate evidentiary support," see Hale v. Big H Constr., Inc., 2012 UT App 283, ¶ 9, 288 P.3d 1046 (citation and internal quotation marks omitted). To make such a showing, a party challenging a finding of fact must "demonstrate that the evidence is legally insufficient to support the finding . . . when viewing [the evidence] in a light most favorable to the court below." Chen v. Stewart, 2004 UT 82, ¶ 76, 100 P.3d 1177 (citation and internal quotation marks omitted). "[A] party challenging a trial court's factual finding must do more than merely reargue the evidence supporting his or her position." Hi–Country Estates Homeowners Ass'n v. Bagley & Co., 2008 UT App 105, ¶ 19, 182 P.3d 417 (citation and internal quotation marks omitted). Rather, he or she

> must present the evidence in a light most favorable to the trial court and not attempt to construe the evidence in a light favorable to [his or her] case. [The challenging party] cannot merely present carefully selected facts and excerpts from the record in support of [his or her] position. Nor can [he or she] simply restate or review evidence that points to an alternative finding or a finding contrary to the trial court's finding of fact.

Chen, 2004 UT 82, ¶ 78, 100 P.3d 1177 (citations omitted). Then after marshaling "all the evidence supporting the finding," the challenging party must "demonstrate that the evidence is legally insufficient to support the findings." Reid v. Mutual of Omaha Ins. Co., 776 P.2d 896, 899 (Utah 1989). The challenging party must also bear in mind that "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a).

¶ 13 The Austins have failed to meet this burden. Their approach to this issue seems to focus on three principal arguments about the evidence before the trial court. Their first contention is based on a recital of evidence that supports their position that Mrs. Bingham's medical treatment was unrelated to the Austins' interference with the right-of-way. By focusing on that evidence, the Austins largely ignore significant evidence from the Binghams that supports the court's decision that Mrs. Bingham's medical issues resulted from the Austins' actions. For example, the Binghams described multiple acts of intimidation and harassment by the Austins in the two months before Mrs. Bingham sought medical treatment. Mrs. Bingham testified that she had been the target of at least two verbal assaults by the Austins in early 2009 and reported that the ongoing dispute had caused her to be "worried about the safety of [her] children . . . [,] about the safety of [her] husband daily . . . [, and] about the safety of [her]self." She told the court that it was due to the Austins' "threats" that she "checked [her] self into the ER" in March 2009. This evidence demonstrates that the Austins have failed to bear their burden on appeal of showing that the trial court clearly erred in finding that Mrs. Bingham sought medical treatment because of the Austins' conduct.

¶ 14 Second, the Austins claim that certain testimony offered by a neighbor about a particular threat to Mr. Bingham was hearsay and that the cause of Mrs. Bingham's medical needs was the birth of her child, not the Austins' behavior. These issues are not preserved because the Austins neither objected to the neighbor's testimony at trial nor argued to the trial court that the reason for Mrs. Bingham's medical treatment was the

stress of a new baby. We will not consider unpreserved evidentiary challenges or otherwise disturb the trial court's finding based on a theory that was not advanced at trial. *Winward v. Goodliffe*, 2011 UT App 292, ¶ 9, 263 P.3d 493 ("To preserve a contention of error in the admission of evidence for appeal, a defendant must raise a timely objection to the trial court in clear and specific terms." (citation and internal quotation marks omitted)); *see also Barson ex rel. Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832, 837–38 (Utah 1984) (declining to consider a hearsay objection that was not raised in the trial court and thus not preserved for appeal). Even if we were to consider them, both the challenge to the neighbor's testimony and the "new baby" theory amount to no more than arguments about the weight of the evidence and are insufficient to carry the Austins' heavy burden of showing clear error in the factual finding supporting the court's decision. *See Chen*, 2004 UT 82, ¶¶ 76, 78, 100 P.3d 1177.

¶ 15 Finally, the Austins contest the $3,000 award on the basis that the Binghams did not provide any receipts or documentation at trial to demonstrate that they incurred the claimed expenses or that the expenses were not covered by insurance. Mrs. Bingham, however, testified that the "ER visits are around $1500. The medication was very expensive.... We figured all in all we were into it about $3000." This testimony supports the court's decision. The absence of documentary evidence is not fatal to the Binghams' claim for medical damages. Although it is true that documentary evidence, such as bills or receipts, may provide a more accurate picture of the scope of the damage, "trial courts are often faced with the necessity of making factual findings based exclusively on oral testimony." *Henshaw v. Henshaw*, 2012 UT App 56, ¶ 12, 271 P.3d 837; *see also* Utah R. Civ. P. 52(a) (explaining that deference must be given to the trial court's findings of fact, whether those findings are based on *oral* or documentary evidence). The trial court explained that it was "persuaded" by Mrs. Bingham's recollection that her medical bills totaled $3,000. When there is credible evidence—oral or documentary—to support the finding, the finding is not

clearly erroneous, even if stronger evidence might have been provided. *Hale*, 2012 UT App 283, ¶ 9, 288 P.3d 1046.

¶ 16 In sum, there is evidence to support the trial court's finding that Mrs. Bingham incurred $3,000 in medical treatment as a result of the Austins' behavior in connection with the right-of-way dispute, and we will not disturb it.

## II. $7,000 for Interference with the Right–of–Way

¶ 17 The Austins also challenge the trial court's findings that "the Binghams sustained ... $7,000[ ] in damages for [the] inconvenience of unnecessarily opening and closing gates" along the right-of-way "for 1,232 days ... an average of 4 times a day." The Austins challenge these findings by arguing that the damages are based on approximations and do not accurately reflect the Binghams' usage.

¶ 18 The Austins first contend that the Binghams failed to adequately establish the amount of damages because they based their costs on approximations. To recover damages, a party must prove the fact that damages occurred and the amount of those damages. *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985). The Austins do not dispute that the Binghams incurred damages as a result of the Austins' interference with the usage of the right-of-way, only the sufficiency of their proof of the amount of those damages.

¶ 19 Proof of the amount of damages does not require precision. *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1166 (Utah 1983). Rather, a plaintiff need only put on "evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages." *Atkin*, 709 P.2d at 336. Proof of damages may therefore "be based upon approximations, if ... the approximations are based upon reasonable assumptions or projections." *Id.* This is because once the fact of damages has been established, any uncertainty in the amount of damages must be borne by the

wrongdoer. *Id.; see also Cook,* 664 P.2d at 1166.

¶ 20 At trial, Mr. Bingham testified that for a period of 1,200 days,[3] he had opened the three gates on the right-of-way four times a day. Mr. Bingham estimated that the inconvenience of the extra time and effort involved amounted to $1 per gate, or $12 per day, for a total of about $14,000 in damages. Although Mr. Bingham did not explain how he reached the estimate, the nominal amount of $1 per gate appears to be his effort to quantify the cost of the hassle and inconvenience of having to exit his vehicle and accomplish the task of opening the gate—a task that was, at times, deliberately made more difficult by the Austins. Indeed, even the trial court recognized that the value of this kind of harm is a "tough one to estimate." The Austins did not provide any contrary testimony but instead sought to undercut Mr. Bingham's testimony by pointing out that "the $1 per gate ... [was] just a dollar amount that [Mr. Bingham] assigned" after he had testified the day before that he "did not put a dollar amount on anything." And the trial court seemed to give some weight to that concern when it determined that Mr. Bingham's "figure for the opening of the gate[s] is too high" and entered a finding that the damage to Mr. Bingham from having to open all the gates across the right-of-way multiple times daily over a period of several years was $7,000, or just under $0.50 per gate. That the Austins had wrongfully imposed an extra burden of time, effort, and aggravation on Mr. Bingham, and did so deliberately, is not disputed, and the amount of damages he suffered is not calculable by any ready measure or formula. *Cf. Weeks v. Calderwood,* 191 P.3d 1, 3 (Utah 1979) (noting that general damages in a personal injury case, such as pain and suffering, "are necessarily largely subjective and difficult to appraise in precise money value"). The court's approach seems a reasonable attempt to quantify the burden, and we therefore conclude that the Austins have

not demonstrated any error in the trial court's determination of the gate-related damages.

¶ 21 Next, the Austins contend that the court's findings that the Binghams were damaged by having to open the gates four times a day for all 1,232 days that the gates were closed was erroneous because it failed to take into account any decreased usage on weekends, holidays, sick days, vacations, etc. Mr. Bingham testified, however, that he used the right-of-way four times a day every day for 1,200 days, and the Austins failed to elicit any contrary testimony. Thus, given Mr. Bingham's undisputed testimony, there is evidence to support the court's findings that "the Binghams sustained ... damages for [the] inconvenience of unnecessarily opening and closing gates" along the right-of-way "for 1,232 days ... an average of 4 times a day." *See generally Hale v. Big H Constr., Inc.,* 2012 UT App 283, ¶ 9, 288 P.3d 1046 ("A finding is clearly erroneous ... if the finding is without adequate evidentiary support...." (citation and internal quotation marks omitted)). The Austins' argument therefore amounts to a challenge to the weight of the evidence, a matter we leave to the judgment of the trial court that heard and considered the evidence, *see Henshaw v. Henshaw,* 2012 UT App 56, ¶ 12, 271 P.3d 837 (explaining that it is the role of the factfinder to weigh the evidence and assess credibility).

### III. $8,600 for Improvement of the Alternative Entrance Way

¶ 22 The Austins contend that the trial court's finding that the Binghams "spent $8,600.00 in fencing and culverts to make the alternate route usable" is clearly erroneous. To support this position, they assert that Mr. Bingham offered testimony about the cost of the improvements on the first day of trial ($8,000) that was inconsistent with his testimony on the second day ($8,600), rendering his estimate of damages too unreliable to support the trial court's award. They also

---

3. From the time the Austins began closing the gates in January 2009 until trial in June 2012, 1,232 days had elapsed. Mr. Bingham apparently rounded this figure down and referred to the time period as 1,200 days. The trial court was more precise and referred to the actual number of elapsed days. The thirty-two day difference does not affect our analysis, and for accuracy, we use the 1,200–day figure when referring to Mr. Bingham's testimony and the 1,232–day figure when referencing the court's decision.

contend, as they did with the damages for medical expenses, that the trial court erroneously accepted the $8,600 estimate without supporting documentary evidence.

¶ 23 Mr. Bingham testified on the first day of trial that he "put in $8000 worth of culverts and fence" to improve the neighbor's pasture enough to make it passable. On the second day of trial, Mr. Bingham testified that he had made "some effort to try to put some numbers to it" and that "to just make [the alternative route] passable by putting culverts and fence . . . was almost $8600." A $600 inconsistency, explained as the result of further reflection about the matter overnight, does not seem to be so significant as to render the whole of his testimony incredible or speculative or to render clearly erroneous the court's determination that Mr. Bingham's testimony was credible. *See Woodward v. LaFranca*, 2013 UT App 147, ¶¶ 16, 19, 305 P.3d 181 (concluding that the trial court exceeded its discretion when it rejected the testimony of a custody evaluator as not credible when the testimony contained only "minor inconsistencies" that were "not sufficient to compromise the [evaluator's] overall credibility"). Rather, it appears that the court accepted Mr. Bingham's explanation that on the first day of trial, he provided a ballpark figure, but by the second day, he had made "some effort" to further refine the amount expended. *See generally* Utah R. Civ. P. 52(a) ("[D]ue regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."); *Hal Taylor Assocs. v. Unionamerica, Inc.*, 657 P.2d 743, 749 (Utah 1982) (explaining that when there is conflicting testimony, an appellate court assumes that the trial court believed the testimony that supports its finding).

¶ 24 Furthermore, the absence of documentary evidence to support Mr. Bingham's claim for $8,600 in improvement damages does not render the court's finding clearly erroneous. As discussed above, *see supra* ¶ 15, written documentation can, at times, carry greater weight than oral testimony about damage amounts, but trial courts are capable of making findings from oral testimony as well. *Henshaw*, 2012 UT App 56, ¶ 12, 271 P.3d 837. Because there is credible evidence in the record to support the trial court's finding that the Binghams expended $8,600 to improve the alternative entrance, we will not disturb it.

## IV. $12,000 for Additional Time and Travel

¶ 25 The Austins also assert that the trial court's decision to award the Binghams $12,000 for the extra time and travel Mrs. Bingham expended to use the alternative entrance is not supported by sufficient evidence. The court awarded the Binghams $4,000 to compensate them for Mrs. Bingham's having to "travel 8/10 of a mile longer to and from their home averaging ten times a day for 1013 days for a total of 8104 miles." The 8,104 miles could be traveled at no more than 20 miles per hour, and thus the court also awarded the Binghams $8,000 for the "405 hours additional time" it took to drive the alternative route. In calculating the damage award for additional travel time, the court accepted testimony that Mrs. Bingham's additional time should be compensated at a rate of $20 an hour.

¶ 26 The Austins raise three concerns regarding the court's award of $12,000 in damages for additional travel time. First, they seem to challenge the mileage and time calculations. Second, they challenge the usage estimation. Finally, they challenge the valuation of Mrs. Bingham's time.

¶ 27 First, the Austins appear to claim that there is insufficient evidence to support the trial court's findings that Mrs. Bingham spent 405 additional hours to travel an additional 8,104 miles on the alternative route between June 2009, when the alternative route was built, and June 2012, when trial was held. The Austins, however, have failed to acknowledge evidence in the record that supports the court's determination. *See generally* Utah R. Civ. P. 52(a) (directing appellate courts not to "set aside [a finding of fact] unless clearly erroneous"); *Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 9, 288 P.3d 1046 ("A finding is clearly erroneous . . . if the finding is without adequate evidentiary support. . . ." (citation and internal quotation marks omitted)). Regarding the additional travel distance, Mr. Bingham testified that "it is .8 miles longer to go around using the

[alternative] access through the pasture." He also said that Mrs. Bingham "on average has about five different errands to run every day ... [s]o that's 10 times that she has to go that extra .8 miles." Mr. Bingham calculated that the alternative entrance has been in use "for over 1,000 days"—at least since litigation commenced in June 2009—"so that's 8100 miles" of extra travel. Mr. Bingham requested compensation for the extra mileage at the standard IRS reimbursement rate of $0.50 per mile (a rate the Austins do not challenge). With respect to the additional time that Mrs. Bingham expended in traveling the alternative route, she testified that she could travel at no more than five miles per hour in her vehicle because of the primitive condition of the route through the neighbor's pasture. Mr. Bingham testified that Mrs. Bingham could travel the .8–miles at "about 20 miles an hour." The Austins did not put on any contrary evidence; instead, they simply attempted to undercut these calculations by pointing out that Mrs. Bingham herself did not testify that she uses the alternative route ten times each day and that she normally is not compensated for her travel time while running errands. The court resolved the dispute in favor of the Binghams but based its award on the higher travel speed that Mr. Bingham testified to, an estimate significantly more favorable to the Austins than Mrs. Bingham's estimate of five miles per hour.

¶ 28 The Austins' second argument is that the court's findings did not take into consideration the number of days that the alternative entrance was not used due to wet conditions that made the route impassable or the weekends, holidays, sick days, vacation days, etc. when Mrs. Bingham's use of the alternative route diminished. As with the use of the right-of-way, there was testimony from both Mr. and Mrs. Bingham that she used the alternative entrance for 1,000 days, and Mr. Bingham testified that Mrs. Bingham took ten trips a day on the alternative route. The Austins did not elicit any evidence about decreased usage on weekends or holidays or due to illness or travel. While the Austins' claim that the alternative route was sometimes impassable has support in the record, it appears that Mr. Bingham discounted his

estimate in the first place. Mrs. Bingham testified that the alternative route had existed for a couple of years "since about the time ... this litigation commenced" on June 1, 2009. Between June 1, 2009, and June 13, 2012, when trial concluded, 1,108 days had elapsed. Mr. Bingham's figure of 1,000 days therefore seems to leave room for periods of time when the alternative route was impassable. And although the Austins contend that there was conflicting testimony in the record that demonstrated that Mrs. Bingham used the right-of-way through the Austins' property at least some of the time during the more than 1,000 days that the alternative entrance was available, we defer to the trial court's superior ability to evaluate and weigh the evidence and the relative credibility of each witness, *Henshaw v. Henshaw*, 2012 UT App 56, ¶ 12, 271 P.3d 837, and assume that the court believed the evidence that supported its findings, *Hal Taylor Assocs. v. Unionamerica, Inc.*, 657 P.2d 743, 749 (Utah 1982).

¶ 29 Finally, the Austins claim that Mr. Bingham's testimony that Mrs. Bingham's time is worth $20 per hour lacks foundation because it is not supported by any work or educational history or any information about prevailing wages in the area. In essence, the Austins are objecting to the admissibility of the evidence for lack of foundation. But the Austins made no such objection to this evidence at trial and instead have raised the issue for the first time on appeal. "To preserve a contention of error in the admission of evidence for appeal, a defendant must raise a timely objection to the trial court in clear and specific terms." *Winward v. Goodliffe*, 2011 UT App 292, ¶ 9, 263 P.3d 493 (citation and internal quotation marks omitted). "[B]y not objecting at trial on the basis of lack of foundation," the Austins have not preserved the objection for appeal. *See Clayton v. Ford Motor Co.*, 2009 UT App 154, ¶ 49, 214 P.3d 865. Accordingly, we decline to consider the Austins' claim that Mr. Bingham did not offer a foundation for his testimony that Mrs. Bingham's time was worth $20 an hour.

¶ 30 Because the objection cannot be considered for the first time on appeal, we must treat the testimony that Mrs. Bingham's time

was worth $20 an hour as properly before the trial court, in which case the court was entitled to consider it in reaching its decision regarding the amount of damages. Thus, the Austins' only reviewable challenge must be to the weight that could be given that testimony. As we have discussed, however, decisions about how much weight to give to certain evidence are properly left to the finder of fact to resolve. *Henshaw*, 2012 UT App 56, ¶ 12, 271 P.3d 837. And the trial court's decision to weigh that evidence in the Binghams' favor is therefore well within its discretion, and we cannot second-guess it on appeal.

¶ 31 Accordingly, we conclude that the Austins' challenges to the trial court's findings with regard to Mrs. Bingham's additional time and travel are not well taken.

### V. Attorney Fees on Appeal

 ¶ 32 The Binghams request their attorney fees on appeal. The trial court awarded attorney fees to the Binghams pursuant to the bad faith statute because "the vast majority of the [Austins'] claims and more importantly the defenses of the Austins ... have been without factual or legal merit" and were not brought in good faith. *See* Utah Code Ann. § 78B-5-825 (LexisNexis 2012) ("In civil actions, the court shall award reasonable attorney fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith."). The Austins have not challenged the propriety of the court's award of fees under the bad faith statute.

¶ 33 "[W]hen a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998) (citation and internal quotation marks omitted). This is true even when the basis for attorney fees in the trial court is the bad faith statute. *Id.* (awarding attorney fees incurred on appeal where the appellees received bad faith attorney fees in the trial court and prevailed on appeal); *Livingston Fin., LLC v. Migliore*, 2013 UT App 58, ¶¶ 9, 11, 299 P.3d 620 (per curiam) (same), *cert. granted*, 308 P.3d 536 (Utah July 10, 2013) (No. 20130337); *Dantine v. Shores*, 2011 UT App 392, ¶ 7, 266 P.3d 188 (per curiam) (same). Accordingly, we award reasonable attorney fees on appeal to the Binghams and remand the case to the trial court to determine the amount.

### VI. Conclusion

¶ 34 We affirm the damages judgment for the Binghams. We grant the Binghams' request for their attorney fees incurred on appeal and remand for the trial court to calculate the amount.